NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0689n.06

Case No. 13-2625

**FILED**

Sep 04, 2014

DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ASHIMA JAMES, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| LIBERTY LIFE ASSURANCE COMPANY | ) | MICHIGAN |
| OF BOSTON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: SILER and KETHLEDGE, Circuit Judges; WATSON, District Judge.[*]

**SILER**, Circuit Judge. Following an automobile accident, Ashima James was denied long-term disability benefits under her group disability insurance policy issued by Liberty Life Assurance Company of Boston ("Liberty Life") to her employer DTE Energy ("DTE"). James filed this action against Liberty Life pursuant to the Employees Retirement Income Security Act ("ERISA"), and the district court awarded James long-term disability benefits. We **AFFIRM**.

**BACKGROUND**

I.      **James's Disability Insurance**

As a full-time employee of DTE, James was a participant in the Welfare Benefit Plan and was insured under the DTE Group Disability Income Policy (the "Policy"), which was issued by

---

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

Liberty Life. In order to be eligible for long-term disability benefits during the first 24 months, the Policy employs an "Own Occupation" standard; namely, the claimant must be "unable to perform the Material and Substantial Duties of his regular occupation or any other occupation with the company for which the [claimant] is qualified and which is offered at not less than their current rate of pay." After the 24-month period, a claimant may be eligible for continued benefits if she "is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." The Policy defines "Any Occupation" as "any occupation that the [claimant] is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity" to perform. The Policy also contains a 24-month maximum period for benefits where the claimant's disability is due to mental illness.

A claimant seeking long-term disability benefits must produce proof of disability to qualify under the Policy. The Policy defines "Proof" as:

> the evidence in support of a claim for benefits and includes, but is not limited to, the following:
> 1. a claim form completed and signed (or otherwise formally submitted) by the [claimant] claiming benefits;
> 2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the [claimant's] attending Physician; and
> 3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

## II.     James's Accident and Resulting Medical Treatment and Examinations

On August 4, 2011, while on short-term medical leave for a surgery not relevant to this appeal, James was a passenger in a vehicle that was rear-ended by another vehicle. She was taken to an emergency room and the following day saw her primary care physician, Dr. Robert Chang, board-certified in internal medicine, who advised her to take off work for at least two

weeks because of "strain to her thoracic spine and chest wall, contusions and strain." He then referred her to a host of specialists throughout her treatment.

Dr. Thomas Nabity, who is board-certified in physical medicine and rehabilitation, treated James from August 2011 to February 2012. During his consult examination, Dr. Nabity found "worrisome" right shoulder pain with limited movement and ordered a magnetic resonance imaging ("MRI") of the rotator cuff. He also diagnosed her with thoracic myofascial pain and anxiety attacks. He recommended James receive a formal psychiatric diagnosis and start physical therapy. He later ordered an MRI of her cervical spine because of James's further complaints of pain. The MRIs revealed a right shoulder labral tear, supraspinatus tendonitis, and cervical degenerative arthritis with moderate to severe foraminal stenosis and mass effect on the cord. Dr. Nabity began administering epidural injections after James complained of worsening neck pain following an attempt to return to work. The injections improved her neck pain at first; however, her pain eventually returned and, according to Dr. Nabity, was "as severe if not more severe than before." Throughout his treatment, he continually found that James was unable to return to work.

James was also referred to Dr. Cheryl Mazzara, a board-certified psychiatrist, who treated her from November 2011 to June 2012. Dr. Mazzara originally diagnosed James with major depressive disorder, single episode, moderate, and generalized anxiety disorder. She later diagnosed James with major depressive disorder, recurrent, severe without psychotic features, and generalized anxiety disorder, and retained this diagnosis throughout her treatment.

At DTE's request, two doctors also conducted independent medical examinations ("IMEs") of James. First, on October 11, 2011, Dr. Shlomo Mandel, board certified in occupational, internal, and environmental medicine, examined James and issued an IME report to DTE. Dr. Mandel found tenderness in James's paracervical and trapezius region, as well as

"very limited" range of motion in the cervical spine "with significant decrease in flexion and extension, as well as rotation and side bending bilaterally." Dr. Mandel found that her "[p]hysical examination [was] remarkable for extensive subjective difficulty, with very little range of motion of the shoulders and essentially no grip measured in the right compared to the left upper extremity." However, he concluded that, while "there [were] a great deal of subjective findings" and James's prognosis was fair, there was an "absence of any objective clinical findings to substantiate her ongoing complaints," and James could return to work without limitation.

Second, psychiatrist Dr. Saul Forman examined James on two occasions. In his first IME report in October 2011, Dr. Forman diagnosed James with posttraumatic stress disorder ("PTSD"), acute, with depression, and found that her prognosis was fair. However, he concluded that, "[f]rom a psychiatric point of view, she [was] able to work without restriction." Then, in his second IME report in December 2011, Dr. Forman changed his opinion and found James unable to return to work. During his examination, he asked James to complete a Beck Depression Inventory test, which indicated that James had significant depression. Dr. Forman diagnosed James with mood disorder due to general medical condition with severe depression, major depressive disorder, single episode, and PTSD with depression.

### III. James's Application for Long-Term Disability Benefits

DTE paid James's six-month short-term disability benefits through February 24, 2012, without objection. However, on March 2, 2012, Liberty Life denied James's claim for long-term disability benefits, finding that she did not meet the "own occupation" definition of disability under the Policy. In addition to considering the results of the IME reports of Drs. Mandel and Forman, Liberty Life also supported its decision with the reports of two doctors who conducted

file reviews but did not personally examine James. Dr. Thomas Gratzer, board-certified forensic psychiatrist, and Dr. Jaime Foland, board-certified in physical medicine and rehabilitation and pain medicine, submitted a joint report of their findings from the file review.

After listing what medical documents he had reviewed, Dr. Gratzer found "a lack of objective evidence to indicate that Ms. James was psychiatrically impaired, limited, or restricted," and that "[t]he treatment records almost exclusively focus on Ms. James'[s] physical complaints." He stated that Dr. Mazzara had noted a comorbid diagnosis of major depression. He also discredited Dr. Forman's finding of psychiatric disability based on a high Beck Depression Inventory score because the test was a self-report and not an objective measure. He then found that James was not psychiatrically disabled because her subjective complaints were not supported by objective mental status exams, psychological testing, or documentation.

Dr. Foland likewise reviewed medical documents and diagnosed James with right shoulder pain due to mild osteoarthritis and degenerative changes and suggestion of a tear in her shoulder. Dr. Foland concluded that, from a physiatrist's perspective, James could return to work with restrictions on reaching above shoulder level with her right arm, carrying more than ten pounds, and on extending her cervical spine beyond neutral. While the doctors agreed that James could return to work, they disagreed on the impact of James's comorbid diagnosis. Dr. Gratzer found that James did not have a comorbid diagnosis impacting her impairment, but Dr. Foland found that her anxiety and depression impacted her physical impairments.

Liberty Life further supported its decision with an occupational analysis and vocational review by a vocational rehabilitation consulting company, which found that James's work was performed in a sedentary capacity. As a result, Liberty Life found that James was able to perform the material and substantial duties of her occupation within the restrictions given by Dr. Foland.

### IV. James's Administrative Appeal

In August 2012, James filed an administrative appeal of Liberty Life's decision to deny her long-term disability benefits under the Policy and added updated records from Drs. Chang and Nabity, as well as new records from Dr. Christine Liff, a neuropsychologist, and Dr. Violette Henein, a rheumatologist.

Dr. Liff met with James on two occasions in June and July 2012 to conduct a neuropsychological evaluation of James. She found that James had "grossly intact cognitive functioning" but found that James's "self-report of depression, anxiety, and persistent pain, coupled with her variable performance on select tasks during testing, suggest[ed] that her emotional and physical distress and reduced coping skills [were] negatively affecting her cognitive abilities." Dr. Liff diagnosed James with adjustment disorder with mixed anxiety and depressed mood and pain disorder. Dr. Henein also met with James on two occasions in May and June 2012. She diagnosed James with inflammatory arthritis based on lab results, as well as cervicalgia neck pain, bursitis and tendinitis of the shoulder, and polyarthralgia. However, Dr. Henein found that James's spine did not exhibit mysofascial trigger points and that the spine and shoulder had full range of motion.

Liberty Life then solicited two additional doctors for file reviews. Dr. Sarah Deland, board-certified in psychiatry and neurology, and Dr. Steven Lobel, board-certified in physical medicine and rehabilitation/pain medicine, reviewed James's file and agreed that the documentation did not support impairment, restrictions, or limitations from each of their respective specialties.

Dr. Deland found that James was not disabled from a psychiatric perspective based on the provided medical evidence, despite finding supportable diagnoses of major depressive episode

and generalized anxiety disorder. She exchanged messages with Dr. Mazzara, who stated that James's "primary disability is medical, not psychiatric," although Dr. Mazzara also reported that she believed James could not work. Dr. Deland noted that all of Dr. Mazzara's mental status examinations indicated normal thought processes, satisfactory concentration, and no memory problems, despite any self-reports of impairment to the contrary. Dr. Lobel found that the medical records supported diagnoses of tendinosis, labral tear, and cervical stenosis, and that James's self-reported pain in the neck and shoulder were "reasonable given the [MRIs]." However, he found inconsistencies between James's self-reports of pain, the MRIs, and her symptoms and concluded that the medical evidence did not support impairment or the need for restrictions or limitations.

Liberty Life denied James's appeal, citing a lack of objective evidence that James's conditions precluded her from performing her job.

## V.     James's Civil Complaint

James then filed this action for long-term disability benefits against Liberty Life pursuant to 29 U.S.C. § 1132(a)(1)(B), a civil enforcement provision of ERISA. The district court entered judgment in James's favor and granted her long-term disability benefits under the two-year own-occupation coverage retroactive to February 24, 2012, and effective through February 24, 2014. The court found that the preponderance of the evidence in the administrative record supported a finding that James was disabled from performing her regular occupation.

The court found that "the principal weakness of Liberty's evidence against disability is that the doctors who reviewed James's file did so from either a physical pain/rehabilitation perspective or a psychological perspective, not both." It held that, while "neither her physical nor

psychological impairments, standing alone, [were] disabling," James's disability claim was validated by the comorbidity of her condition.

The court declined to address whether James would qualify under the "any occupation" coverage and whether the "mental health symptoms" rider applied because these issues would be not be ripe until February 24, 2014, and would potentially involve a different or expanded administrative record. It therefore remanded these issues to Liberty Life for consideration.

## STANDARD OF REVIEW

Where an ERISA plan grants a plan administrator discretionary authority to determine eligibility for benefits or to construe the plan terms, we would review the denial of benefits under the "highly deferential arbitrary and capricious standard of review." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006) (internal quotation marks and citation omitted). However, the parties agreed at the district court level and here that our standard of review is de novo. Therefore, like the district court, we review the record that was before the plan administrator de novo, without giving deference to the administrator's decision or any presumption of correctness. *See Perry v. Simplicity Eng'g, a Div. of Lukens Gen. Indus., Inc.*, 900 F.2d 963, 966 (6th Cir. 1990).

## DISCUSSION

Liberty Life requests we vacate and reverse the district court's judgment in favor of James. However, we agree with the district court's determination that the preponderance of the evidence in the administrative record supports a finding that James was disabled within the meaning of the Policy. The record supports a finding that James was suffering from a comorbid diagnosis of physical ailments complicated and amplified by psychiatric disorders that prevented

her from performing her regular occupation. Therefore, she was entitled to receive benefits under the Policy from February 24, 2012, to February 24, 2014.

As a preliminary matter, Liberty Life argues that the district court erred in giving more weight to James's treating physicians' opinions than its consulting physicians because, under *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), treating physician opinions are not entitled to any special weight. The district court found the opinions of Drs. Nabity and Mazzara "[m]ost weighty" because they were James's most frequently-visited treating physicians. The court then assigned less weight to the IME opinion of Dr. Mandel for discrediting all subjective findings and even less weight to the file reviews of Drs. Foland, Gratzer, Lobel, and Deland, who "only purported to evaluate James's file from a purely physical pain or psychiatric perspective, not both."

While there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005), "[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider" in determining whether a claimant is entitled to benefits under a plan. *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005).[1] Therefore, while we cannot "require administrators automatically to accord special weight to the opinions of a claimant's physician," *Nord*, 538 U.S. at 834, we can ourselves consider the administrator's reliance on file reviews. *Calvert*, 409 F.3d at 295; *see also Smith v. Bayer Corp. Long Term Disability Plan*, 444 F. Supp. 2d 856, 873-74 (E.D. Tenn. 2006), *aff'd in*

---

[1] Although the de novo standard of review applies in this case, we find case law applying the arbitrary and capricious standard to be persuasive for evaluating the same or similar issues. *See Pierzynski v. Liberty Life Assur. Co. of Boston*, No. 10-14369, 2012 WL 3248238, at \*4 (E.D. Mich. Aug. 8, 2012) ("While the arbitrary and capricious standard does not apply in this case, the Court finds this case law persuasive in evaluating conclusory independent medical reports.").

*part, vacated in part*, 275 F. App'x 495 (6th Cir. 2008) (attaching little significance to file reviews in the context of psychiatric evaluations because the specialty is dependent upon interviewing and spending time with patients).

The district court did not improperly weigh the various physicians' opinions. At most, the court regarded the fact that the file reviewers did not physically examine James as a factor in its consideration. However, the court's explicit reason for giving less weight to the file reviewers' opinions was that they took piecemeal approaches to their evaluations, instead of holistically viewing James's comorbid conditions. Therefore, the lack of physical examination was not determinative for the court on discounting the file reviewers' opinions.

Having determined that the district court did not improperly weigh the various physician opinions, we find that the proof produced by James established by a preponderance of the evidence that she was entitled to long-term disability benefits under the regular occupation standard of the Policy, first, because the weight of the evidence favors a finding that James was disabled and, second, because James produced ample subjective and objective evidence that she was unable to return to work.

First, the weight of the evidence favors a finding that James was disabled. Importantly, Drs. Nabity and Mazzara, who treated James over a period of months and who were able to monitor her progress and setbacks, were in agreement that James could not return to work. Dr. Nabity continually found that James was unable to return to work because of the injuries to her shoulder and spine and the resulting pain. He recommended James undergo a psychiatric evaluation because he recognized symptoms of anxiety. He also treated James after her attempted return to work, noting that she could not complete the first day because she "had severe pains radiating from her neck into her arms" and that "she [] had worsening pain ever

since." Dr. Mazzara noted no history of psychiatric disorders prior to the accident and diagnosed James with depression and anxiety throughout her treatment. While she indicated that James's primary disability was medical, she told Dr. Deland she did not think James could return to work.

Likewise, Dr. Henein, who met with James on two later occasions, confirmed injuries to her shoulder and spine and diagnosed James with inflammatory arthritis. Dr. Liff, who also met with James twice, found that James suffered from anxiety and depression and that her emotional and physical distress were negatively affecting her cognitive abilities. Therefore, each of James's treating physicians independently diagnosed James with psychical and psychiatric disorders traceable to the injuries she sustained to her shoulder and spine in the automobile accident.

In contrast, the physician opinions relied upon by Liberty Life in denying James benefits are inconsistent in concluding that James was not entitled to disability benefits. After examining James on behalf of DTE, Dr. Mandel found no objective clinical findings to substantiate James's complaints and that she could return to work without restrictions. However, he found her examination to be "remarkable" for extensive subjective difficulty, wherein James demonstrated very little range of motion and "essentially no grip" in her right arm. Therefore, Dr. Mandel concluded that there were no objective indicators of disability, despite his in-person observations that James had a fair prognosis and limited use of her injured arm.

Liberty Life also reviewed the psychiatric examinations conducted by Dr. Forman on behalf of DTE, wherein Dr. Forman first found James able to return to work, despite diagnosing her with PTSD and depression. After conducting a Beck Depression Inventory test, however, Dr. Forman found James to be severely depressed and to again be suffering from PTSD as a result of the accident, thereby disabling her from returning to work.

The conclusions of Liberty Life's file reviewers were likewise erratic in their observations and conclusions. Dr. Gratzer found that James was not psychiatrically disabled because her subjective complaints were not supported by objective mental status exams, psychological testing, or documentation, and discredited Dr. Forman's use of the Beck Depression Inventory test because it was a self-report tool. However, psychiatrists typically treat symptoms that are subjective and must rely on a patient's subjective descriptions to evaluate and diagnose the patient. *See Smith*, 444 F. Supp. 2d at 873 (quoting *Sheehan v. Metro. Life Ins. Co.*, 368 F. Supp. 2d 228, 254-55 (S.D.N.Y. 2005)). Therefore, the use of a subjective self-report tool to make objective psychiatric findings should not have been discredited. Then, Dr. Foland acknowledged that James's MRIs documented actual injuries but concluded that she could return to work with restrictions. In their joint report, Dr. Gratzer found that James did not have a comorbid diagnosis, but Dr. Foland disagreed, finding that James's anxiety and depression impacted her physical impairments. However, Dr. Foland concluded that "[f]rom a physiatrist's perspective [James could] return to work."

Dr. Deland found that James was not psychiatrically disabled, despite supportable diagnoses of depression and anxiety, because her mental status examinations rendered normal results. Dr. Lobel found that James was not physically disabled by her injuries because of inconsistencies between the subjective and objective evidence, despite explicitly finding that James's self-reported pain was congruent with the MRI results. Therefore, each of the file reviewers concluded that James was able to return to work, despite their findings to the contrary.

Perhaps more troubling, the file reviewers' piecemealed medical opinions all overlooked the comorbidity of James's diagnosis. The joint reports of Drs. Gratzer and Foland and Drs. Deland and Lobel each purported to analyze whether James was disabled from a psychiatric or a

physical pain standpoint, *not* from a holistic view. Despite their designation as "joint" reports, the physicians' opinions fail to recognize each other's findings, whereas James's treating physicians considered the physical injuries and the psychological consequences, as demonstrated by Dr. Chang's referral to multiple doctors, Dr. Nabity's recommendation that James seek psychiatric treatment, and Dr. Mazzara's recognition that James's disability was primarily physical. Dr. Foland even recognizes that James has a comorbid diagnosis, wherein her psychiatric impairments are affecting her physical impairments, but then finds James could work from a purely physical perspective.

Furthermore, on appeal, Liberty Life continues to structure its argument that James is not disabled by discussing her physical condition and psychiatric condition separately. It argues that "there is no evidentiary support for the District Court's [] conclusion that the cause for Ms. James['s] disability claim is 'co-morbid[.]'" We can only assume from its use of quotation marks and the addition of a hyphen that Liberty Life is claiming that the concept of comorbidity is novel. However, courts within our circuit have discussed comorbid conditions in the context of ERISA claims for disability benefits. *See, e.g., Eastin v. Reliance Standard Life Ins. Co.*, No. 2012-140 (WOB-CJS), 2013 WL 4648736 (E.D. Ky. Aug. 23, 2013) (slip copy). Moreover, Liberty Life specifically asks their file reviewers whether a claimant has a comorbid diagnosis impacting the claimant's impairment, thereby acknowledging the importance of reviewing a claimant's disability as a whole.

Second, James produced ample subjective and objective evidence that she was unable to return to work. Throughout its argument, Liberty Life stresses the lack of objective evidence produced by James and the requirement of such evidence under the Policy. However, the Policy does not require the claimant to *only* produce objective evidence. Under the plain language of the

Policy, proof "includes, but is not limited to . . . forms of objective medical evidence." Therefore, evidence beyond the enumerated categories that Liberty Life considers objective is allowable to substantiate a claim of disability under the Policy. *See Pierzynski v. Liberty Life Assur. Co. of Boston*, No. 10-14369, 2012 WL 3248238, at *4 (E.D. Mich. Aug. 8, 2012) (interpreting the same Liberty Life Policy language to allow objective and subjective evidence for proof); *see also Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d 546, 563 (W.D. Pa. 2009) (finding it unreasonable to reject subjective evidence where the applicable policy does not restrict the type of evidence that may be used to demonstrate disability).

Moreover, other courts considering this issue have found it inappropriate for an administrator to dismiss a claimant's self-reports and other subjective evidence of disability, particularly where the administrator has no basis for believing the evidence is unreliable. *See Schwarzwaelder*, 606 F. Supp. 2d at 562-63 (gathering cases). Liberty Life did not have an indication that James's subjective evidence was unreliable, but in fact had many reasons to credit her self-reports. Dr. Foland found physical injuries that required restrictions upon James's return to work, and Drs. Forman and Deland found her psychiatric diagnoses supportable. Dr. Lobel even specifically found that James's self-reports of pain were "reasonable given the [MRIs]."

Furthermore, some aspects of James's comorbid diagnosis are not capable of confirmation through objective indicators. Complaints of pain necessarily are subjective as they are specific to the patient and are reported by the patient. *See Pierzynski*, 2012 WL 3248238 at *4.[2] Psychiatric opinions are also inherently subjective. *See Westphal v. Eastman Kodak Co.*, No. 05-CV-6120, 2006 WL 1720380, *4-5 (W.D.N.Y. June 21, 2006) (finding that psychiatric

---

[2] Even so, we again emphasize that the majority of the physicians were able to tie James's complaints of pain to specific injuries, including Dr. Lobel, who agreed that James's self-reports of pain correlated to the MRI results.

diagnosis is inherently subjective because a proper diagnosis requires a personal evaluation of the patient's credibility and affect). Unlike most doctors treating physical symptoms, a psychiatrist must treat a patient's subjective symptoms by interviewing the patient and spending time with the patient so as to understand and treat the subjective symptoms described by the patient. *See Smith*, 444 F. Supp. 2d at 873 (quoting *Sheehan*, 368 F. Supp. 2d at 254-55).

Even setting aside the subjective evidence, James produced sufficient objective evidence to qualify for disability benefits under the Policy. In her application, James produced MRIs, records of her physical examinations, chart notes, lab and other test results, and physician diagnoses, all of which qualify as objective medical evidence under the Policy.

**AFFIRMED**.