OPINION
SARGUS, District Judge.
Plaintiff Vicki Koning sued defendant United of Omaha Life Insurance Company (“the Plan”), alleging that the Plan denied her claim for long-term disability (“LTD”) benefits in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1)(B),. (“ERISA”). The district court granted summary judgment to the Plan, finding the Plan had properly denied Koning benefits. Because the Plan did not properly consider Koning’s appeal in the first instance, we remand to the district court with instructions to remand to the Plan for appropriate consideration *426 of Koning’s claim in accordance -with this opinion.[1]
I. BACKGROUND
Koning is a 53-year-old woman who was employed as the Human Resources Manager for American Metal & Plastics, Inc., in Grand Rapids, Michigan, until she stopped working as a result of chronic neck and back pain. Koning was covered under the Plan, which served as the provider of group long term disability insurance for American Metal & Plastics, Inc. (“American”).
A. Medical History
The administrative record shows that Koning’s leg and back pain began in 1999, and despite progressive treatments including anti-inflammatory medications, courses of physical therapy, nerve-blocks, and spinal surgeries, her back pain ultimately was not resolved, and in time she also experienced neck pain of her cervical spine in addition to lumbar back pain. A recitation of her medical issues follows.
In 1999, while in her late thirties, Ms. Koning was a hairdresser, and owned a beauty shop. She underwent spine surgery on her lower back in 2002.[2] In June, 2004, she was referred to Dr. John Ehlert, an orthopaedic and spinal surgeon, for a spinal* consultation “regarding problems of lower back pain and bilateral, right greater than left, leg pain.” After examining her MRI scan, Dr. Ehlert opined that she had a herniated L4-5 disc, and a herniation of the L5-Sldisc. He explained various treatment options, and she started with a non-surgical treatment option, taking a high-dose anti-inflammatory medication and stopping physical therapy. Dr. Ehlert explained that “she has a degenerative disc at this level and another below and with a central disc herniation the risk of recurrent disc herniation is higher and there are long term complications.” He recommended a Medrol Dose Pak followed up by Celebrex, and then a re-evaluation. If the medication did not help, he recommended an epidural, and if those treatments failed, her recommended surgical intervention. (R. 13-3, PagelD 151-53).
On September 24, 2004, Ms. Koning was referred to the Holland Community Hospital Pain Management Center for a consultation with Dr. Keith Javery, regarding “a 4-year history of persistent back pain, frequent lower extremity pain, right worse than left, down the lower extremities as well as neck pain and right arm pain.” (R. 13-5, PagelD 403), Dr. Javery noted that she “demonstrated significant range of motion difficulties both actively and passively. She had positive facet provocative testing throughout the neck at C3 to C7 and throughout the lumbar spine at L2 to L5 bilaterally.” He was able to reproduce her chief complaint with “disc loading maneuvers,” and then administered an epidural treatment to her spine. Because the “disc provocative testing” remained “quite positive” he suggested continuation of the epidural injection therapy. The second treatment was not as successful in treating her pain. Dr. Javery referred her to Dr. Lowry for a surgical consultation. Dr. Lowry was not in her insurance group, and her insurance company directed her to Dr. Jurgen Luders. (R. 13-5, Page ID 404-410).
On January 25, 2005, at age 42, Ms. Koning had surgery for her herniated *427 discs. Dr. Luders performed a lumbar laminectomy.[3] He found that “[ijmaging demonstrated a very large L4-5 central herniated disk causing significant compression of the thecal sac and a left paracentral L5-S1 herniated disk.” Dr. Luders removed “a very large disk fragment” at the L4-5 level. “A diskectomy was performed on the left side at L5-S1 in the same manner.” (R. 13-2, PagelD 167). The surgery provided relief, and Ms. Koning returned to work. On August 18, 2005, she returned to Dr. Luders for a follow-up visit, and for pain radiating up into the area above her right ear. Dr. Luders performed a nerve block in the office. (R. 13-5, PagelD 359). Ms. Koning found she could no longer be on her feet as a hairdresser, and she modified her position to manager of the salon. Ultimately, on December 16, 2006, Ms. Koning took a position as the Human Resources Manager at American Metal & Plastics. From 2006 through 2012, Ms. Koning performed her job as Human Resources Manager. On July 10, 2012, she stopped working due to back pain and physical limitations-and began receiving short term disability benefits.
B. Dr. Fitzgerald’s medical opinion of disability
From 1999, when Koning was in her late thirties, to 2013, when Koning was in her early fifties, her pain continued to require management, her back condition continued to deteriorate, and she began to experience neck pain. From 2004 on, she was treated at the Holland Community Hospital Pain Management Center by Dr. Keith Javery, and then by his partner, Dr. Kevin Fitzgerald. After years of increased pain and physical limitations, she was ultimately deemed disabled by her treating physician, Dr. Kevin Fitzgerald.
She applied for short-term disability benefits, which United paid up to January-11, 2013. On January 31, 2013, Dr. Fitzgerald completed a “Physician’s Statement” indicating a primary diagnosis of lumbar radiculopathy, with symptoms of back and lower extremity pain, based on the objective findings of “disc degeneration and bulging discs” with a secondary contributing condition of lumbar degenerative disc disease and lumbar spondylosis. He restricted her from all work through March 11, 2013, when she would be reevaluated. (R. 17-1, Page ID 1224). On April 15, 2013, the Plan denied Ms. Koning’s claim, stating in its letter of denial that the medical documentation on file “does not support restrictions and limitations that would preclude you from performing the material duties of your regular occupation as a human resources manager.” (R. 15-2, PagelD 701).
Meanwhile, Dr.' Fitzgerald ordered a functional capacity evaluation (FCE), which was performed by a physical therapist on April 3, 2013. (R. 15-2, PagelD 728 through R. 15-3, PagelD 764). The physical therapist used the Physical Demand Characteristics of Work chart, Light (PDL) to evaluate her ability to do her predominantly sedentary office job,[4] opin *428 •ing that Koning’s “tolerance for dynamic sitting is 30 minutes, dynamic standing 10 minutes/standing 5 minutes and walking 10 minutes, sitting with ability to change positions as needed and walking at her own pace.” (R. 15-2, PagelD 733). In his General Neurological Comments, he noted that Ms. Koning had “Wide spread pain, poor tensed posture, muscle tension and fatigue, restricted ROM [range of motion], diffuse right sided weakness, disturbed gait, chronic headaches, de-conditioning, poor tolerance to ADLs [activities of daily living].” (R. 15-3, PagelD 757). He also posited that “[possible fear of re-injury may be affecting the test results.” (R. 15-3, PagelD 757).
C. Disability Plan
The Plan provides for an initial 180-day “elimination period” during which LTD benefits will not be paid to a disabled person under the policy. During the elimination period, American is self-funded for short-term disability benefits and pays them on a weekly basis. American paid short-term disability payments to Koning in their available entirety up until January 11, 2013. After the short-term disability benefits run out, an employee may be eligible for LTD benefits. To be eligible for such benefits, an employee must have, because of “an injury or sickness, a significant change in ... mental or physical functional capacity” such that she is “prevented from performing at least one of the material duties of [her] regular occupation on a part-time or full-time basis.... ” (R. 13-1, PagelD 73). After a benefit has been paid for 24 months, the definition of “disability and disabled” means “you are unable to perform all of the material duties of any gainful occupation. Disability is determined relative to your ability or inability to work. It is not determined by the availability of a suitable position with your employer.” (Id.). The Plan reads as follows:
Definition of Disability: Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:
• Prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
• Unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.
After a Monthly Benefit has been paid for 24 months, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation. Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with your employer.
(RE 13-1, Page ID # 73).
The Plan may “sometimes require that a claimant be examined by a Physician or vocational rehabilitation expert of our choice,” but will “not require more than a reasonable number of examinations.” (Id., at PagelD 96). The Plan provides for an “Initial Claims Decision” by the Plan, and an administrative appeal to the Plan from an “Adverse Benefit Determination.” (R. 13-1, PagelD 97-99). In deciding an appeal based on a “medical judgment,” consultation will be made with “a health care professional” with “appropriate training in the field of medicine involved” in the judgment. (Id., at PagelD 99).
*429 D. Short-Term Disability Benefits
Ms. Koning applied to the Plan for short-term disability benefits after she was determined by her physician, Dr. Kevin Fitzgerald, a board-certified anesthesiologist, to be medically unable to work.[5] Her last day worked was July 10, 2012, and she was granted benefits up to January 11, 2013. (R. 16-2, PagelD 1168). When these benefits expired, Koning applied for LTD benefits, and included in her application a “Physician’s Statement” from Dr. Fitzgerald, placing her “off work” through “3-11-13” and with a “prognosis for recovery” of “unknown — will evaluate next appointment.” (R. 17, PagelD 1223-24). Her employer, American, confirmed to the Plan that Koning was off work on “doctor’s orders.” (R. 17, PagelD 1227-28). In its “Long-Term Disability Claim Employer’s Statement,” American stated that Ms. Koning had been “given remote access and worked from home sometimes” in answer to the question of whether there were “any changes to the employee’s job responsibilities due to the disabling condition before the employee became fully disabled.” In response to the question of “[h]ow long will the employee’s job be held open?” the response was “no time — position must be filled immediately.” (R. 17-1, PagelD 1226-27). Ms. Koning’s employment was terminated when her short-term disability ended on January 18, 2013. (R. 16-5, Page ID 1187).
E. Long-Term Disability Benefits
When her short-term disability benefits expired, Koning filed with the Plan all of the documents necessary to perfect her application for LTD benefits under the Policy, including the “Long-Term Disability Claim Physician’s Statement” signed by Dr. Fitzgerald on January 31, 2013, (R. 17-1, PagelD 1223-1224); the “Long-Term Disability Claim Employer’s Statement” and “Job Analysis” signed by American’s representative on January 16, 2013, (R. 17-1, PagelD 1226-1228); the “Long-Term Disability Claim Employee’s Statement” signed by Koning on January 18, 2013, (R. 17-1, PagelD 1230-1231); and hundreds of pages of medical records, detailing back surgeries, physical therapy, and numerous pain treatment programs. On April 15, 2013, a member of the Plan’s “Group Insurance Claims Management,” wrote to Koning advising her “we have determined that we are unable to approve benefits and your claim has been denied.” (R. 15, PagelD 694-703). The letter based the denial primarily on a “review” by an unnamed “Medical Consultant” performed March 6 and March 19, 2013, and an “Occupational Analysis” by an unnamed “Vocational Rehabilitation Consultant,” leading the Plan to conclude that “the medical documentation on file does not support restrictions and limitations that would preclude you from performing the Material Duties of your Regular Occupation as a human resources manager.” (R. 15, Pa-gelD 701).
The Plan obtained the review from employees at “University Disability Consortium,” a commercial entity in Massachusetts. The “Occupational Analysis” was performed by an employee with a Master’s of Science degree. Her brief report made no reference to Koning’s particular medical conditions, and did not explain what part of Koning’s treating physician’s professional medical opinion was discredited, and why. She conceded that she did not examine or meet Koning personally. (R. 14, PagelD 542-544). Similarly, the *430 “Medical Record Review” by the same commercial group was performed by a registered nurse with a Bachelor’s of Science and nursing degree, who also did not examine or meet Koning personally. She reached the conclusion that the “medical records available for review fail to support any restrictions or limitations from a sedentary demand level,” and that “[n]o impairments are supported.” (R. 15-5, Pa-gelD 854-863). Again, the report does not explain what part of Koning’s treating physician’s professional medical opinion was discredited, and why. The denial letter advised that Koning could direct a written appeal to the Plan within 180 days. The appeal policy states:

APPEALS OF ADVERSE BENEFIT DETERMINATIONS

You may appeal within 180 days following Your receipt of notification of an Adverse Benefit Determination.
You will have the opportunity to submit written comments, documents, records, and other information relating to the claim.
Our review will not give deference to the initial Adverse Benefit Determination.
In deciding an appeal of any Adverse Benefit Determination that is based in whole or in part on a medical judgment, the individual conducting the appeal will consult with a health care professional:
(a) who has appropriate training and experience in the field of medicine involved in the medical judgment; and
(b) who is neither an individual who was consulted in connection with the Adverse Benefit Determination that is the subject of the appeal, nor the subordinate of any such individual.
(R. 13-1, PagelD 99) (emphasis supplied).
Koning obtained counsel, and in her appeal, attached again several hundred pages of her medical records, dating from 2004. Included in the submission was an updated “Physician Statement of Disability” by Koning’s treating anesthesiologist, Dr. Fitzgerald, confirming his medical judgment that he “continuefs] to keep Mrs. Koning off work,” and continues in his “medical judgment” to consider her “disabled from her regular occupation as a Human Resources Manager and any other full-time occupation at this time.” Dr, Fitzgerald’s updated medical opinion reported the following:
PHYSICIAN STATEMENT OF DISABILITY
1. My name is Kevin Fitzgerald. I am a Medical Doctor licensed by the State of Michigan, Certified in Anesthesiology with a primary specialty in Pain Management.
2. My address is Michigan Pain Consultants, 2147 Health Drive, Wyoming, Michigan 49519.
3. Vicki Koning is a long standing patient of Michigan Pain Consultants. Prior to my treatment, Mrs. Koning was a patient of my former partner, Keith Javery, D.O.
4. Mrs. Koning has been diagnosed with the following neck and back conditions for which I provide pain management:
• Spinal stenosis
• Degenerative disc disease L3-4, L45,L5-S1
• Degenerative disc disease C4-5, C56
• Post laminectomy pain syndrome
• Lumbar spondylosis with radicullitis
• Lumbosacral spondylosis
*431 • Cervical spondylosis with radicullitis
• C7-8 radiculopathy
• Large central disc protrusion L4-5
• Disc Bulge L5-S1
• Bilateral L5 radicular syndrome
• Lumbar canal stenosis C4-5
• Spondylosis C2-3, C4-5, C5-6
• Chronic cerviealgia due to facet arthropathy at the 4th, 5th and 5th cervical segments;
• Cervicogenie headaches.
5. It is my understanding that Mrs. Koning underwent spine surgery in 2002; followed by a lumbar laminectomy and discectomy at L4-5 on January 25, 2005; and a right posterior cervical lymph node excision on August 12, 2005. Despite surgical intervention, courses of physical therapy, epidural injections, cervical facet injections, nerve root block and rhizotomies, Mrs. Koning continues to experience:
• Chronic and severe back pain;
• Chronic and severe neck pain;
• Bilateral lower extremity pain;
• Bilateral shoulder and arm pain;
• Pain that radiates into her back buttocks and legs;
• Inability to sleep due to her physical pain.
• Unable to sit, stand and/or bend for any significant period of time.
6. As a result of her medical conditions, I agreed that Mrs. Koning should discontinue working as a Human Resources Manager for American Metal & Plastics and I understand her last day worked was on July 10,2012.
7. In accordance with her employment, I am aware that Mrs. Koning applied for long term disability benefits the United of Omaha Insurance Company, which were denied on April 15, 2013, on the basis of a functional capacities evaluation (which I ordered) by Sakari Perttula, P.T.
8. I have reviewed Mr. Perttula’s functional capacities evaluation report as well as the United of Omaha’s April 15th correspondence.
9. I have considered Mr. Perttula’s findings and conclusions and continue to keep Mrs. Koning off work.
10. It is my medical opinion that Vicki Koning is disabled from her regular occupation as a Human Resources Manager and any other full-time occupation at this time.
(RE 13-2, Page ID # 158-159).
The doctor also attested that, to the extent that the Plan based any of its denial on the functional capacity examination of Koning conducted by a physical therapist pursuant to his orders, he disagreed with the Plan’s interpretation of the examination findings. (R. 13, PagelD 158-159).
In response to Koning’s appeal, the Plan again did not engage a physician to assess Dr. Fitzgerald’s opinion, despite the Plan’s provision that:
In deciding an appeal of any Adverse Benefit Determination that is based in whole or in part on a medical judgment, the individual conducting the appeal will consult with a health care professional:
(e) toko has appropriate training and experience in the field of medicine involved in the medical judgment
(R. 13-1, PagelD 99) (emphasis supplied).
At no time did the Plan consult a board-certified pain management doctor. Rather, the evidence in the record shows that the Plan sent medical records to a “nurse *432 case manager” with the following instructions:
Please review and identify any restrictions and limitations supported by the documentation in [sic] file, with the understanding if something is not listed as a restriction or limitation, they would be capable of performing the function.
Does the indicated activity level appear to be in accordance with the documentation in the file? Please indicate how it does or does not.
Please provide any guidelines concerning the time frame to update medical records. For instance, should medical records be updated every month, every three months or is this a condition that would require" an update in four to six months?
(R. 17-1, PagelD 1247-1252).
The nurse reviewed documents in the file, and reported that, in her “Medical Analysis” “[t]here was no observable change in the CH’s physical status from a spine or pain standpoint from prior to last day worked to current available notes.” She asserts:
Exams have revealed no loss of strength, ambulation assistance or neurological deficits. She consistently appears in no acute distress with stable vital signs, which is not reflective of significant pain causing a systemic issue. The CH present unaccompanied at visits signifying she is driving and transferring independently. The FCE on 4/03/13 determined the CH’s perception of her capacity of functioning is lower than what she is capable of performing. It was suggested she could perform at the “light” physical capacity level.
In my opinion the CH would be precluded from lifting/carrying > 20 pounds, repetitive bending and twisting at the waist. She would require the ability to make routine position change every 1-hour for 5 minutes or the use of a sit-to-stand work station to change position at will.
Id. at 1250.
The “Medical Analysis” was prepared without ever examining Koning, or consulting with her physician, a board certified pain management doctor. Having no independent knowledge, the nurse, for example, could have no idea how far Koning had driven for thé appointment or whether she was, in fact, in acute pain.
II. STANDARD OF REVIEW
The de novo standard of review was employed by the district court, and is the appropriate standard of review on appeal. The Sixth Circuit set forth the standard of review in Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609 (6th Cir.1998):[6]
The standards of review for determining ERISA denial-of-benefits claims are well-established. See Firestone, 489 U.S. at 115, 109 S.Ct. 948, 103 L.Ed.2d 80; see also Rowan, 119 F.3d at 435. In cases in which a plan administrator is given no discretionary authority by the plan, review of the plan administrator’s decision by the district court — as well as the court of appeals — is de novo, with respect to both the plan administrator’s interpretation of the plan and the plan administrator’s factual findings. See Firestone, 489 U.S. at 115, 109 S.Ct. 948, *433 103 L.Ed.2d 80; Rowan, 119 F.3d at 435. When conducting a de novo review, the district court must take a “fresh look” at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator. See Perry 900 F.2d at 966; see also Rowan, 119 F.3d at 437.[7]
Id. at 618.
II. ANALYSIS
A. Merits
After reviewing the record, we conclude that the Plan failed to adequately evaluate the evidence presented. The Plan ignored favorable evidence submitted by her treating physician(s), selectively reviewed the evidence it did consider from the treating physicians, failed to conduct its own physical examination, and heavily relied on non-treating nurses and other non-physicians.

1. Ignoring Favorable Evidence from Rowing’s Treating Physicians

“[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians.” Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). However, they “may not arbitrarily refuse to credit a claimant’s reliable evidence, including the opinions of a treating physician.” Id. at 834, 123 S.Ct. 1965. “[A] plan may not reject summarily opinions of a treating physician, but must instead give reasons for adopting an alternative opinion.” Shaw v. AT & T Umbrella Benefit Plan No. 1, 795 F.3d 538, 548-49 (6th Cir.2015), citing Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 620 (6th Cir.2006). In Shaw, this Court found that the Plan acted arbitrarily and capriciously where a claimant’s medical records and functional capacity evaluation showed that he was unable to sit or stand for more than 30. minutes, and had to lie down to recuperate. The Court explained that a Plan cannot ignore favorable evidence from a treating physician, but must “ ‘give reasons’ for rejecting a treating physician’s conclusions”. Id., citing Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program, 763 F.3d 598, 608-09 (6th Cir.2014) (finding that the plan acted arbitrarily and capriciously in denying benefits for a mental disorder in part because the plan failed to “ ‘give reasons’ for rejecting a treating physician’s conclusions.”).
Here, as in Shaw, the Plan ignored favorable evidence from Honing’s treating physicians. In rejecting Honing’s claim for LTD benefits, the Plan stated “the medical documentation in the file does not support restrictions and limitations that would preclude you from performing the Material Duties of your Regular Occupation as a human resources manager.” (R. 15, PagelD 701). Specifically, the Plan based its denial on the findings of the records reviewer, stating that:
Ms. Honing’s occupation as a Human Resources Manager is a sedentary strength occupation. A sedentary strength occupation requires Ms. Honing to exert up to 10 lbs. of force occasionally and or negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects.
[Ajfter submitting Ms. Honing’s file for a medical review, we believe that although Ms. Honing’s MRI results have revealed mild discogenic degenerative change at the C4-5 and C5-6 levels, the *434 examinations have demonstrated no loss of strength, ambulation assistance or neurological deficits. Ms. Koning was constantly noted to be in no acute distress with stable vital signs, which is not reflective of significant pain causing a systemic issue. Additionally, the FCE that was completed on April 3, 2013, indicated Ms. Koning could perform in the light physical capacity level. Therefore, Ms. Koning would not be restricted from performing her sedentary strength occupation as a Human Resources Manager.
(R. 13-2, PagelD 135-137).
This brief analysis does not address Dr. Fitzgerald’s medical opinion that Koning has “chronic and severe back pain; chronic and severe neck pain; bilateral lower extremity pain; bilateral shoulder and arm pain; pain that radiates into her back, buttocks, and legs; inability to sleep due to her physical pain; and [is] unable to sit, stand and/or bend for any significant period of time.” (R. 13-2, PagelD 158). The Plan cites no medical evidence in conflict with Dr. Fitzgerald’s conclusions.
Additionally, the cited FCE used the Physical Demand Characteristics of Work chart, Light (PDL) to evaluate Koning’s ability to do her predominantly sedentary office job, and the therapist found that she could not sit for more than 30 minutes at a time, and had “[w]ide spread pain, poor tensed posture, muscle tension and fatigue, restricted ROM [range of motion], diffuse right sided weakness, disturbed gait, chronic headaches, de-conditioning, poor tolerance to ADLs [activities of daily living].” (R. 15-2, PagelD 733; R. 15-3, PagelD 757). These conclusions are also at odds with the Plan’s statement that Koning’s “examinations have demonstrated no loss of strength.” (R. 13-2, PagelD 135-137). The Plan simply contradicts the medical findings without explaining why, and without offering any evidence to contradict these medical observations, even though a functional capacity evaluation “is generally a reliable and objective method of gauging the extent one can complete work-related tasks.” Shaw, 795 F.3d at 548. This is particularly unconvincing in light of the fact that Dr. Fitzgerald specifically stated that he had considered the findings and conclusions of the FCE in determining that Koning cannot perform any full-time occupation at this time. Instead of offering adequate medical evidence to rebut Dr. Fitzgerald’s opinions, the Plan’s non-physician file reviewers simply concluded that Koning could perform sedentary work.

2. Selectively Reviewing Treating Physician Evidence

This Court has held that a plan administrator acts arbitrarily and capriciously when it “engages in a selective review of the administrative record to justify a decision to terminate coverage.” Metro. Life Ins. Co. v. Conger, 474 F.3d 258, 265 (6th Cir.2007) (internal quotation marks omitted). Here, the Plan’s file reviewers engaged in a selective review when they concluded that Koning was not disabled, without adequate medical evidence to refute her treating physician’s diagnoses. The records review specifically discounts her pain.
For example, a review of one of her physical therapy notes would show that her cervical range of motion is “restricted.” Her therapist reported “Flexion: 35 degrees/pain on the right; Extension: 30 degrees/pain on the right; Rotation (left): 50 degrees/pain on the right; Rotation (right): 50 degrees/pain on the right. Palpation and tenderness was found right neck and upper back. Mobility testing reveals hypo mobility at OA and upper thoracic. Ms. Koning reports the pain being *435 related to turning.” “She has not achieved the set goals of decreased pain and irritation and functional ROM,” (R. 16-2, Pa-gelD 1038). However, the nurse reviewing the medical records for the Plan states in her “Medical Analysis”:
The claimant has numerous somatic[8] reports of pain that is [sic] in excess of physical or diagnostic findings. While there is note of the claimant having cervical lumbar pain, there is no current documented diagnostic testing, such as demonstrating subulaxation, MRI or CT, demonstrating spinal or foraminal steno-sis, or EMG/NCS, demonstrating radiculopathy. Furthermore, there is no documented pathological reflexes, muscle weakness, atrophy, hypertrophy, fasciculation’s [sic], decreased sensation to light touch pinprick vibration or proprioception. There is no documentation of any pathology of station of the head or neck with forward flexion, nor is there any documentation of the claimant having unkempt hair supporting her report of pain. There is no documentation of antalgic gait, no spinal instability documented on x-rays, no erythema, edema, synovitis, no palpable muscle spasms.
(R. 15-5, PagelD 858).
This conclusion ignores evidence of Koning’s restricted range of motion, her prior spinal surgeries, the MRI results and other tests documenting degenerative disk disease, her reported and documented chronic pain, and her treating physician’s findings.
Courts have held this type of selective review to be arbitrary and capricious, and have pointed out the concern for conclusions based on “logical leaps.” In Blajei v. Sedgwick Claims Management Services, Inc., 721 F.Supp.2d 584, 604-05 (E.D.Mich.2010), the district court held that a plan administrator’s decision to terminate a claimant’s benefits based on conclusory reports from medical consultants was arbitrary and capricious, finding that the file review physician’s report indicated that the physician had “selectively cherry-picked” the medical records to support his non-disability finding.
Further, Dr. Pick appears to have at best haphazardly selected, and at worst cherry-picked, a handful of objective reports (MRI, CT, x-ray, EMG, etc. reports) to comment upon. Dr. Pick mentions an August 2005 lumbar x-ray that “has an impressive successful fusion at L5-S1; but does not comment upon a June 2005 cervical MRI which found “[c]ervical spondylosis ... contributing to left greater than right stenosis.”
Id. In finding that the file reviewing physicians’ reports “are conclusory and fail to adequately discuss, let alone rebut, the diagnoses of Plaintiffs treating physicians,” the court noted that the reports are also “tainted with other indicia of unreliability,” including the “logical leap” that because Plaintiff can drive, she can work *436 at a computer for 8 hours per day.” Id. at 606.[9]
Defendants are correct that Section 1138 does not require a denial letter to describe every detail relating to the decision to deny benefits; however, a letter completely devoid of any discussion of a claimant’s medical evidence submitted to support disability, or why an IME physician’s conclusions were being favored over a claimant’s physician’s conclusions, does not comport with ERISA’s procedural requirements. See Majeski v. Metropolitan Life Ins. Co., 590 F.3d 478, 484 (7th Cir.2009).
Id. at 611.
This case has similarly fallen short of providing the full and fair review of the record required by ERISA.

3. Failing to Conduct its Own Physical Evaluation

“[T]here is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician.” Calvert v. Firstar Fin. Inc., 409 F.3d 286, 297 n. 6 (6th Cir.2005). However, we have held that the failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, “raise[s] questions about the thoroughness and accuracy of the benefits determination.” Helfman v. GE Grp. Life Assurance Co., 573 F.3d 383, 393 (6th Cir.2009) (quoting Calvert, 409 F.3d at 295).
Here, the Plan specifically reserved the right to conduct its own examination, but chose not to. This is especially troubling because the Plan’s file reviewers “second-guess[ed] [Honing’s] treating physicians” and made “credibility determinations.” Judge v. Metro. Life Ins. Co., 710 F.3d 651, 663 (6th Cir.2013). Unlike Judge, this is not a case where a nurse file reviewer’s findings “simply echo those of [the claimant’s] own doctors.” Id.
The Plan second-guessed Honing’s treating physician when it credited the assumption of the file reviewer that Honing’s FCE showed she could do sedentary work over Dr. Fitzgerald’s conclusion that she cannot (and despite the FCE’s finding that she cannot sit for more than 30 minutes at a time). In its letter denying Honing’s LTD benefits, the Plan relied primarily on the FCE as a reason for its decision to deny her benefits. However, the entire issue before the Plan was whether Honing could perform sedentary work, and Honing’s treating physician, Dr. Fitzgerald, concluded that she cannot — and the FCE results supported the conclusion in its clinical assessment that she could not sit for more than 30 minutes at a time. Given that her “sedentary strength occupation” consists primarily of sitting most of the time, the Plan should have explained the basis for refusing to credit Dr. Fitzgerald’s medical opinion. The above review of the Plan’s decision-making process indicates that the Plan’s denial of Honing’s LTD benefits was in error. “While none of the factors alone is dispositive, we find that, as a whole, they support a finding that [the Plan] did not engage in a deliberate and principled reasoning process.” Helfman, 573 F.3d at 396. We are mindful that judicial review of these matters cannot be a “rubber stamp.” Cox v. Standard Ins. Co., 585 F.3d 295, 302 (6th Cir.2009).
A Significant Change in Physical Functional Capacity
The district court below concluded that the Honing did not carry her burden to prove that she has suffered a significant *437 change in her physical functional capacity, stating “plaintiff must establish more than a change in her subjective experience of a long-term problem with back pain; rather she must demonstrate some real, objective change in her actual capacity.” (R. 29, PagelD 1418). However, Koning may be able to meet this burden. She has sufficiently shown that she was able to work with her back pain for years, and when she needed to take on increasingly sedentary jobs, she did — moving from hair dresser, to salon manager, to human resources manager. When she took the position of human resources manager at American, she was able to work, and did for years. But, as Dr. Fitzgerald observed, Koning discontinued her work in this position as a result of her medical conditions that left her disabled. (R. 13-2, PagelD 1585). That was a significant change in -her functional capacity, as shown by objective evidence — hundreds of pages of medical records detailing back surgeries, physical therapy, and numerous pain treatment programs, and MRI’s and other tets documenting degenerative disk disease.
Courts have addressed the fact that pain is an inherently subjective condition, but no less capable of being disabling. In an unpublished decision, James v. Liberty Life Assur. Co. of Boston, 582 Fed.Appx. 581 (6th Cir.2014), this Court affirmed the district court’s award in favor of the participant. Her board-certified doctor treated her back pain with, among other modalities, epidural injections. Throughout treatment, he found the participant was unable to return to work. The plan administrator ordered independent medical examinations (“IMEs”) by board certified doctors, one of whom examined the participant, and found an “absence of any objective clinical findings to substantiate her ongoing complaints,” and that she could return to work. Id. at 583. The plan denied her claim for long-term disability benefits, based on the IME doctors’ opinions, and also in part on the review of a vocational rehabilitation company that performed an occupational analysis and reported that the sedentary nature of her work made her able to perform “the material and substantial duties of her occupation within the restrictions given by [the doctor].” Id. The participant filed an administrative appeal, and submitted additional medical opinions. The plan hired two additional doctors to conduct file reviews, and they considered her “self-reports of pain, the MRIs, and her symptoms and concluded that the medical evidence did not support impairment or the need for restrictions or limitations.” Id. at 585. The plan denied her appeal, “citing a lack of objective evidence” that her conditions “precluded her from performing her job.” Id.
The district court entered judgment in the participant’s favor, finding that the preponderance of the evidence supported a conclusion that the participant was disabled from performing her regular job. On de novo review, this Court affirmed the district court, finding the participant “produced ample subjective and objective evidence that she was unable to return to work.” Id. at 587. The Court specifically explained that, “[c]omplaints of pain necessarily are subjective as they are specific to the patient and are reported by the patient.” Id. See Pierzynski v. Liberty Life Assur. Co. of Boston, No. 10-14369, 2012 WL 3248238, at *4 (E.D.Mich. Aug. 8, 2012) (“by its very nature, pain is subjective, and the [plan] cannot ignore subjective complaints”). Furthermore, the Court found that the participant produced sufficient objective evidence to support her claim. “MRIs, records of her physical examinations, chart notes, lab and other test results, and physician diagnoses, all ... *438 qualify as objective medical evidence under the Policy.” Id.
B. Remedy
This case is similar to the case in Helfman, 573 F.3d at 396:
‘[Wjhere the problem is with the integrity of the plan’s decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled,’ remand to the plan administrator is the appropriate remedy. Cooper v. Life Ins. Co. of N. Am., 486 F.3d 157, 171 (6th Cir.2007) (quoting Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 622 (6th Cir.2006).)
V. CONCLUSION
For the foregoing reasons, we AFFIRM the judgment of the district court in part, insofar as the district court held that the plan is subject to ERISA, and REVERSE AND REMAND insofar as the district court upheld the denial of benefits by the Plan, with instructions to remand to the plan administrator for a full and fair review consistent with this Court’s opinion.

. We do not address or resolve defendant's pre-existing conditions defense raised by the Plan below but not addressed by the district court.

. The record does not clearly establish the precise date or nature of the procedure.

. The Mayo Clinic discusses the effect of a laminectomy:
Most people report measurable improvement in their symptoms after laminectomy, but the benefit may lessen over time as the spine continues to age or if there is a recurrence of arthritis. Laminectomy is more likely to improve leg pain caused by a compressed nerve than back pain. Because laminectomy can’t stop the buildup from osteoarthritis that caused the nerve compression in the first place from happening again, symptoms may come back over time.
See www.mayoclinic.org/tests ... /laminectomy/ ... / results/prc-2000

. “Sedentary work involves sitting most of the time, but may involve walking or standing for *428 brief periods of time.” (R. 15-4, PagelD 840).

. The administrative record ("R.”) is filed under seal, and consists of R. 13 (Page ID 59-414); R. 14 (Page ID 415-623); R. 15 (Page ID 624-904); R. 16 (Page ID 905-1214); and R. 17 (Page ID 1215-1257).

. As of March 1, 2007, Michigan law prohibits policies containing discretionary authority clauses that would trigger the arbitrary and capricious standard of review, MICH. ADMIN. CODE R. 500.2201-02 (2011), and this Court has upheld the provision. See Am. Council of Life Insurers v. Ross, 558 F.3d 600, 609 (6th Cir.2009) (the Michigan rules fall within the ambit of ERISA’s savings clause and are not preempted by ERISA).

. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); Rowan v. Unum Life Ins. Co., 119 F.3d 433 (6th Cir.1997); Perry v. Simplicity Engineering, 900 F.2d 963 (6th Cir.1990).

. '‘Somatic” pain and "chronic pain” is discussed in the medical literature, and differs from "acute pain":
In general ... there are three types of pain, based on where in the body the pain is felt: somatic, visceral, and neuropathic. Pain of all three types can be either acute or chronic. Acute pain is short lasting and usually manifests itself in ways that can be easily described and observed. Chronic pain is defined as pain lasting more than three months. It is much more subjective and not easily described as acute pain. The three pain types can be felt at the same time or singly and at different times. The different types of pain respond differently to the various pain medications. Somatic and visceral pain are easier to treat than neuropathic pain.... Generally speaking, somatic pain is usually aggravated by activity and relieved by rest.
http://calder.med.miami.edu/pointis/typepain. html

. In this case, the nurse file reviewer includes an opinion there is no “documentation of the claimant having unkempt hair supporting her report of pain.” (R. 15-5, PagelD 858),