GILMAN, J., delivered the opinion of the court, in which KETHLEDGE, J., joined, and MOORE, J., joined in part. MOORE, J. (pp. 664-67), delivered a separate opinion dissenting in part.
OPINION
RONALD LEE GILMAN, Circuit Judge.
Thomas Judge, who underwent surgery to repair an aortic valve and a dilated ascending aorta, applied for disability benefits under a group insurance policy (the Plan) issued by Metropolitan Life Insurance Company (MetLife). MetLife denied benefits, however, when it determined that Judge was not totally and permanently disabled under the terms of the Plan. After exhausting MetLife’s internal administrative procedures, Judge brought this action to recover benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), a provision of the Employee Retirement Income Security Act (ERISA). The district court granted judgment on the administrative record in favor of MetLife.
Judge argues on appeal that MetLife’s denial of benefits was arbitrary and capricious. Specifically, he contends that (1) MetLife applied the wrong definition of “total disability” to Judge’s claim, (2) Met-Life erred in failing to obtain vocational evidence before concluding that Judge was not totally and permanently disabled, (3) MetLife erred in conducting a file review by a nurse in lieu of having Judge undergo an independent medical examination, and (4) there was a conflict of interest because MetLife both evaluates claims and pays benefits under the Plan. For the reasons set forth below, we AFFIRM the judgment of the district court.
I. BACKGROUND
Judge, who has a high-school education, worked as an airline baggage handler and ramp agent for 20 years. As an employee of Delta Airlines, he was covered by Delta’s term life insurance policy. The insurance policy provides for the early payment of benefits of up to $100,000 if an employee becomes totally and permanently disabled. MetLife is both the Plan’s administrator and the payor of benefits. The Plan defines total and permanent disability as follows:
Total and Permanent Disability or Totally and Permanently Disabled means, for purposes of this section, that because of a sickness or an injury ...:
You are expected never again to be able to do:
Your job; and
Any other job for which You are fit by education, training or experience.
In order to claim benefits under the Plan, Judge was required to send MetLife proof that he was totally and permanently disabled and that such total and permanent disability has continued without interruption. The Plan defines “proof’ as follows:
Proof means written evidence satisfactory to Us that a person has satisfied the conditions and requirements for any benefit described in this certificate. When any claim is made for any benefit described in this certificate, Proof must establish: the nature and extent of the loss or condition; Our obligation to pay *655 the claim; and the claimant’s right to receive payment.
After his brother was diagnosed with an ascending aortic aneurysm, Judge saw his own physician and learned that he had a similar problem with a dilated ascending aorta. Cardiac surgeon C. Michael Deeb recommended surgery to replace the ascending aorta and remove a mass on Judge’s aortic valve. Judge underwent surgery in March 2010 and has not returned to work with Delta since. He was 47 years old at the time of the surgery. In November of 2010, Judge filed a claim with MetLife for a lump-sum disability benefit.
Judge submitted several post-surgery reports from his physicians in support of his claim. These physicians included Dr. Deeb, Dr. Himanshu J. Patel (who worked with Dr. Deeb), and Dr. Daniel Harber, another of Judge’s treating physicians. MetLife considered each of these reports in evaluating Judge’s claim.
Dr. Deeb examined Judge in April 2010. In a letter addressed to Dr. Harber and Dr. Corinne Adler (still another of Judge’s treating physicians), Dr. Deeb noted that Judge was “actually doing well.” Judge was “awake, alert, oriented, and neurologically intact.” In addition, Judge was “up and about, freely mobile.” Dr. Deeb advised that Judge could “increase his activity,” but limited him to lifting no more than 15 pounds. These assessments were supported in extensive medical detail.
Judge saw Dr. Patel in July 2010. Dr. Patel noted in a letter to Drs. Harber and Adler that Judge was “alert and oriented and in no acute distress.” He also wrote that a CT scan of Judge’s chest and abdomen showed “an intact repair of his ascending aorta with no evidence of complication.” Because Judge had “an intact aortic repair with a repaired bicuspid aortic valve,” Dr. Patel advised that Judge could “gradually increase his lifting, pushing, and pulling to [a] maximum of 50 pounds” and could “participate in mild-to-moderate intensity level aerobic activities.” Dr. Patel cautioned that Judge required “an additional six weeks’ time off work to complete his physical therapy.” These assessments, too, were accompanied by an extensive discussion of Judge’s medical condition.
In October 2010, Dr. Deeb completed an “Attending Physician Statement.” Dr. Deeb filled in boxes on the form that, without explanation, restricted Judge to two hours of intermittent sitting and zero hours of standing or walking per day. Another box was checked that restricted Judge from reaching above shoulder level, climbing, twisting, bending, or stooping. He was, however, permitted to operate a motor vehicle. In response to the question: “In your opinion, why is patient unable to perform job duties?”, Dr. Deeb wrote: “Lifting restriction 30 to 35 lbs.” But the report also stated that Judge could work eight hours per day and that only his lifting restriction was unlikely to improve. With respect to Judge’s cardiac capacity, Dr. Deeb checked the box for “Class 2 (Slight Limitation).” Judge concedes that Dr. Deeb “noted that Mr. Judge was totally disabled for [only] an indefinite period of time.” There is no further medical explanation contained in or attached to Dr. Deeb’s statement.
In December 2010, Dr. Harber completed his own Attending Physician Statement. Dr. Harber also filled in boxes that restricted Judge to two hours of intermittent sitting and zero hours of standing or walking per day. He similarly stated that Judge could not reach above shoulder level, climb, twist, bend, or stoop, but that he could operate a motor vehicle. Dr. Harber indicated that Judge was unable to perform his job duties because he was not to lift anything over 30 pounds. But he stated that Judge could work eight hours per *656 day and that “[a]ll areas should improve besides [sic] lifting restrictions.” Dr. Harber also classified Judge’s cardiac capacity as “Class 2 (Slight Limitation).” In response to the question: “Have you advised patient to return to work?” Dr. Harber checked the box for “No,” and in response to the next prompt: “Any work/activity restrictions applicable,” he wrote that he was “basing this on Dr. Deeb’s recommendation.” There is no further medical explanation contained in or attached to Dr. Harber’s statement.
A nurse consultant at MetLife, Janice Kinsinger, reviewed the medical reports provided by Judge’s physicians. In her evaluation, she noted the inconsistencies between the first two reports (Dr. Deeb’s April 2010 letter and Dr. Patel’s July 2010 letter) and the last two reports (Dr. Deeb’s October 2010 statement and Dr. Harber’s December 2010 statement). She found no medical evidence supporting the restrictions on Judge’s ability to sit, stand, and walk.
In January 2011, MetLife denied Judge’s claim. MetLife summarized the reports and concluded that (1) Dr. Patel’s letter indicated that Judge “had the capacity to perform at least light duty activities”; (2) Dr. Deeb’s October 2010 statement “did not provide objective medical documentation” as to why Judge was unable to stand or walk and, “[excluding the severe limits to standing and walking,” it appeared that Judge was able to perform light work; and (3) Dr. Harber’s statement did not indicate that Judge’s symptoms “continued to be so severe several months after [his] surgery or that [he was] confined to bed as a result of ... not being able to perform walking or standing activities.”
The denial letter from MetLife concluded that Judge had submitted insufficient information to support a finding of disability under the terms of the Plan, which the letter misstated as requiring that Judge be “expected never again to be able to do any work at all for wage or profit.” Judge was advised in the letter that he could appeal the denial within 180 days and submit additional documentation in support of his appeal. In response, Judge’s attorney stated that Judge had no updated medical documentation and that he relied upon the statements from his treating physicians submitted to date.
A nurse, Diane Englert, reviewed Judge’s documents as part of MetLife’s administrative-appeal procedure. Englert considered the previously submitted reports and noted that no additional medical information had been provided. She concurred with the prior nurse’s conclusion that Judge was recovering as expected from surgery, that there was no evidence of post-operative complications, and that improvement was expected in all areas except the lifting restriction.
MetLife upheld its denial of benefits to Judge in a letter dated April 6, 2011. In this letter, MetLife quoted the correct definition of total and permanent disability and determined that Judge was not disabled as defined by the Plan. MetLife wrote:
Your employer’s plan states the following:
Total and Permanent Disability or Totally and Permanently Disabled means, for purpose[s] of this section, that because of a sickness or an injury ...: You are expected never again to be able to do: Your job; and any other job for which You are fit by education, training or experience....
... When you were seen by Dr. Patel on July 7, 2010, Dr. Patel [] documented you were recovering as expected and recommended that you complete your physical therapy, that you could do mild *657 to moderate intensity aerobic activity, and were allowed to gradually increase your lifting, pushing and pulling to .the maximum of 50 pounds. This information does not indicate you have any limitations with sitting, standing, walking, using your arms or hands or are unable to work in any capacity. Dr. Patel also advised on July 7, 2010 that you would need an additional six weeks off work to complete your physical therapy. Based on this information from Dr. Patel in July, it appeared at that time you were not ready to return to your former job which required you to lift heavy luggage, however you had the capacity to perform at least light duty activities. The echocardiogram done on June 30, 2010 showed improvement after your surgery and that you had only mild aortic steno-sis and a trace amount of aortic regurgitation, and normal ventricular function as the ejection fraction was 60-65%, improved from 55% pre-operatively.
Dr. Deeb completed an Attending Physician Statement October 15, 2010 indicating that your lifting was restricted to 30-35 pounds and that you could work eight hours a day. It is unclear as to why Dr. Deeb advised you could do no standing or walking at all, and only sit for two hours. There is no medical information on or about October 2010 which indicates that you developed other medical condition(s), had a relapse, complications or other event that decreased your functional abilities as per Dr. Patel’s assessment as of July 7, 2010. The most recent information we have is an Attending Physician Statement dated December 23, 2010 from Dr. Harber, who also advised you could not stand or walk, but also noted improvement in all functional areas was expected, except for the limit of lifting above 35 lbs. There is no objective clinical data to explain or support what occurred beyond July 7, 2010 to result in a functional status of essentially being bedridden to wheelchair bound, with no standing or walking ability. The standing and walking function listed is inconsistent with the advised lifting and pushing and pulling capabilities, and also inconsistent with Dr. Harber’s documentation you could work eight hours a day. In addition, Dr. Harber’s notation in December 2010 that improvement in function was expected in all areas other than lifting is consistent with Dr. Patel’s assessment in July 2010, and does not support that you were not continuing to regain additional function for performing work activities, and therefore does not meet the plan provision for being permanently disabled.
II. ANALYSIS
A. Standard of review
“[A] denial of benefits challenged under § 1132(a)(1)(B) [a part of ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.” Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). “When such authority is granted, the highly deferential arbitrary and capricious standard of review is appropriate.” Borda v. Hardy, Lewis, Pollard, & Page, P. C, 138 F.3d 1062, 1066 (6th Cir.1998) (internal quotation marks omitted). The district court in the present case applied the arbitrary-or-eapricious standard of review, and Judge concedes that this is the applicable standard.
A plan administrator’s decision will not be deemed arbitrary or capricious so long as “it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.” Davis v. Ky. *658 Fin. Cos. Ret. Plan, 887 F.2d 689, 693 (6th Cir.1989) (noting that “[t]he arbitrary or capricious standard is the least demanding form of judicial review of administrative action”) (internal quotation marks omitted). We will uphold a benefits determination if it is “rational in light of the plan’s provisions.” Jones v. Metro. Life Ins. Co., 385 F.3d 654, 661 (6th Cir.2004). Our review of the decision of a plan administrator is limited to the administrative record; that is, we “are required to consider only the facts known to the plan administrator” at the time of the decision. Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381 (6th Cir.1996).
In his brief on appeal, Judge refers to a “Hartford policy” and states that his claim for long-term disability benefits under that policy was approved. He also refers to a ruling of the Social Security Administration that discusses light and sedentary work. This latter ruling does not appear to be a ruling on any claim by Judge for such benefits, although Judge’s counsel informed the court at oral argument that Judge has in fact been granted Social Security disability benefits. Nevertheless, because neither the Hartford policy nor any Social Security ruling is in the administrative record, we will not consider them for purposes of this appeal. See Yeager, 88 F.3d at 381.
B. MetLife’s recital of the incorrect standard of “total disability” in its initial denial letter was later corrected
Judge contends that MetLife applied an incorrect definition of total and permanent disability when it denied his claim. He argues that MetLife’s initial denial was based on the incorrect standard that Judge was expected never again to be able to do any work “at all for wage or profit,” and not on the proper standard that he was expected never again to be able to do any work “for which he was fit by education, training, or experience.” MetLife responds by pointing out that it used the correct definition of total disability in its final denial letter. The district court acknowledged that the initial denial letter contained an incorrect definition of disability, but concluded that because the final denial letter stated the correct definition, MetLife did not apply an incorrect definition during the administrative-appeal phase of Judge’s claim. Judge v. Metropolitan Life Ins. Co., 2011 WL 6740748, at *3 (E.D.Mich.).
The district court reached the right result. We are aware that MetLife’s second denial letter, despite initially quoting the correct definition of disability as set forth in the Plan, later refers to Judge’s ability or inability to do “all work activities,” “work in any capacity,” or do “any work activities.” Rather than evidencing that MetLife actually applied the wrong standard in evaluating Judge’s claim, however, these recitals simply demonstrate Met-Life’s use of shorthand jargon. Indeed, immediately following nearly every incomplete statement of the standard detailed above, MetLife reminds Judge that he must show that he is disabled “as defined by the [Pjlan.”
The second denial letter in fact incorporates the correct definition of disability as set forth in the Plan, which states that total and permanent disability is the inability to do any job for which a claimant is fit by education, training, or experience. Although MetLife could have repeated the full definition of total and permanent disability throughout its second denial letter, its shorthand way of referencing the standard does not make its review arbitrary or capricious. Cf. Cook v. Prudential Ins. Co. of Am., 494 Fed.Appx. 599, 608-09 (6th Cir.2012) (“To be sure, Prudential’s decision letter is hardly a model of clarity, and at many points, its stated reasons for de *659 nying Cook’s claims are unduly perfunctory. Even so, we simply cannot conclude from the evidence before us that the record compels — or even strongly supports— a different result.”).
Nor can we conclude, looking at the letter as a whole, that MetLife either misunderstood or misapplied the proper standard as defined by the Plan. MetLife explicitly reasoned that, based on Dr. Patel’s July 2010 letter, Judge “was not ready to return to [his] former job which required [him] to lift heavy luggage,” but that the medical evidence supported the fact that he “had the capacity to perform at least light duty activities.” It further noted that there was no medical evidence beyond this date that showed a decline in functional status to the point of “essentially being bedridden to wheelchair bound, with no standing or walking ability.” These explanations are drawn from MetLife’s internal review, which concluded that Judge could do “moderate aerobic activity,” that he could “gradually increas[e]” his lifting, pushing, and pulling as of July 2010, and that there was no evidence of limitations on his ability to sit, stand, or walk since that time.
In light of these assessments, we respectfully disagree with our dissenting colleague’s critique that MetLife made a “painfully obvious” mistake by erroneously applying an “all work activities” standard. MetLife did not improperly consider, for example, whether Judge could do some job for which he was clearly not fit. Cf. Kalish v. Liberty Mut./Liberty Life Assurance Co., 419 F.3d 501, 506-07 (6th Cir.2005) (noting that the claimant’s capability of performing sedentary work did not preclude a finding of disability because his former occupation required him to walk, stand, and reach, and the plan provision required that a claimant be unable to perform all material and substantial duties of his or her occupation). Rather, MetLife’s discussion of Judge’s abilities takes into consideration his prior experience (the manual labor of lifting heavy luggage) and his continuing ability to do less-strenuous lifting activities, as well as his ability to sit, stand, and walk.
Furthermore, MetLife’s reason for denying Judge’s claim — the lack of medical evidence supporting the conclusion that Judge could not sit, stand, or walk — was consistent throughout the administrative-review process, and the initial letter’s recitation of the wrong standard is merely a harmless error that was rectified upon review. Cf. Kent v. United of Omaha Life Ins. Co., 96 F.3d 803, 805, 807-08 (6th Cir.1996) (finding that the plan administrator substantially complied with the notice requirements of ERISA despite the fact that only the second of two denial letters cited the relevant plan language relating to disability); see also Cameron v. Am. Elec. Power Serv. Corp., 240 Fed.Appx. 297, 303-04 (10th Cir.2007) (holding that an erroneous reference to a different plan in the first denial letter did not require reversal of the district court’s judgment for the plan administrator because the second letter upholding the denial corrected the error, and it was this final determination that the court reviewed); Earl v. Life Ins. Co. of N. Am., 204 Fed.Appx. 592, 593-94 (9th Cir.2006) (upholding the denial of benefits, even though the plan administrator quoted the incorrect definition of disability in letters sent to the claimant, because the evidence indicated that the incorrect definition was quoted by mistake, the claimant had previously received the correct definition of disability, and the plan administrator adhered to a consistent explanation in denying benefits).
Finally, as a practical matter, even if MetLife were found to have applied an incorrect definition of total and permanent disability, a remand to MetLife for recon *660 sideration under the correct definition would be unavailing. As discussed below in Part H.C., the objective medical evidence shows that Judge is not disabled in the sense that he could never again perform any job for which he is fit by education, training, or experience. Cf. Kent, 96 F.3d at 807 (holding that the alleged defects in the claim procedures did not warrant reversal of the district court’s decision because, among other things, remand would represent a “useless formality” when much of the objective medical evidence supported the conclusion that the claimant was not disabled); Beaty v. United States, 937 F.2d 288, 291 (6th Cir.1991) (“Here, the record is complete, and it would be a waste of everyone’s time to remand to the district court what can be decided now as a matter of law.”). We thus find no jurisprudential purpose in remanding to MetLife for reconsideration when it would undoubtedly reach the same conclusion based on the administrative record before it.
C. The administrative record lacks objective medical evidence that Judge is totally and permanently disabled
Judge contends that he is totally and permanently disabled under the language of the Plan. MetLife responds by arguing that Judge has not met his burden of producing satisfactory proof of disability. Judge’s claim was properly denied, according to MetLife, because the administrative record contains substantial evidence that he is not totally and permanently disabled from performing any job for which he is fit by education, training, or experience. Judge contends that MetLife failed to take into account the fact that he has experience only in heavy lifting and that he could not perform similar work. But the definition of “total and permanent disability” does not require that benefits be paid simply because Judge is unable to perform work similar to the work he performed before his surgery. Judge must instead show that he could never again do any work for which he is fit by education, training, or experience.
“[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious. For this, we must examine Met Life’s decision in light of the administrative record.” Spangler v. Lockheed Martin Energy Sys., Inc., 313 F.3d 356, 362 (6th Cir.2002). In the present case, in light of the consistent assessments by Judge’s physicians that his lifting restrictions were unlikely to improve, one can reasonably conclude that Judge will never again be able to lift heavy objects such as luggage. But all other assessments in the record point to improvement in Judge’s functional capacity. Indeed, all of his doctors either anticipated that he would return to work or stated that he could work for eight hours per day. They expected improvement in all areas except lifting. Even Judge concedes that Dr. Deeb did not find him permanently precluded from returning to work.
No objective medical evidence supports Judge’s argument that he is permanently unable to sit, stand, or walk so as to prevent him from doing some other job for which he is fit by education, training, or experience. “Requiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable.” Cooper v. Life Ins. Co. of N. Am., 486 F.3d 157, 166 (6th Cir.2007). The only such evidence in the present case is found in the boxes that Dr. Deeb and Dr. Harber checked that restrict sitting, standing, and walking in their respective October and December 2010 Attending Physician Statements. But neither Dr. Deeb nor Dr. Harber explains what objective medical ev *661 idence supports these restrictions. In addition, the assessment that Judge is able to sit for only two hours at a time and not stand or walk at all is inconsistent with the other findings contained within these same statements. Both Dr. Deeb and Dr. Harber noted, after all, that Judge could work eight hours per day and characterized Judge’s cardiac capacity as “Class 2 (Slight Impairment).”
MetLife’s initial denial letter concluded that the record lacked “objective medical documentation” explaining why he could not stand or walk. Judge was therefore on notice as to the information that he was required to produce in order for his claim to be approved on administrative appeal. He nevertheless chose not to ask Dr. Deeb or Dr. Harber to explain their check marks or to submit updated medical evidence, despite the Plan placing the burden on Judge to establish his disability rather than on MetLife to show to the contrary. Cf. Likas v. Life Ins. Co. of N. Am., 347 Fed.Appx. 162, 167 (6th Cir.2009) (“Plaintiff must provide ‘continued proof of his disability under the policy; LINA does not bear the burden of showing that plaintiffs eligibility has ended.”). Accordingly, Met-Life made the final determination that the record lacked objective medical evidence to support a finding of disability: “There is no medical information on or about October 2010 which indicates that you developed other medical condition(s), had a relapse, complications or other event that decreased your functional abilities as per Dr. Patel’s assessment as of July 7, 2010.” Instead, MetLife determined that Judge was not “permanently unable to return to work as defined by the plan.” This conclusion is supported by substantial evidence, including the notes prepared by Dr. Deeb in April 2010 stating that Judge could increase his activity, Dr. Patel’s assessment that Judge could do mild-to-moderate intensity-level aerobic activities, and Dr. Deeb’s and Dr. Harber’s statements that Judge could work eight hours per day.
We further note that the Attending Physician Statements provided space for Dr. Deeb and Dr. Harber to give narrative responses to the following questions: “In your opinion, why is patient unable to perform job duties?”, “Do you expect improvement in any area?”, and “Any work/activity restrictions applicable (please be specific) [?]” Because Dr. Deeb and Dr. Harber failed to provide any reasoning to support their inconsistent assessments of Judge’s functionality on forms that explicitly invited an explanation, and because the record is likewise devoid of detailed clinical or diagnostic evidence supporting their determinations that Judge could not stand or walk, MetLife’s conclusion that no objective evidence supported Dr. Deeb and Dr. Harber’s check-offs was neither arbitrary nor capricious.
D. MetLife was not required to obtain vocational evidence before making its determination
Judge also contends that MetLife should have provided a job analysis by consulting a vocational expert about his employability in light of his limitations. As stated above, there is objective evidence supporting Judge’s permanent inability to perform his prior occupation of baggage handler, but there is no objective evidence supporting further limitations on sitting, standing, or walking. The issue is therefore whether MetLife was required to consult a vocational expert to provide evidence of other jobs for which Judge is qualified in light of his education, training, and experience that do not involve heavy lifting.
Based upon the applicable caselaw, Met-Life was not required to do so. See Douglas v. Gen. Dynamics Long Term Disability Plan, 43 Fed.Appx. 864, 870 (6th Cir. *662 2002) (holding that the plan administrator was not required to offer testimony from a vocational expert as to the types of jobs plaintiff could perform given his disabilities before the plan administrator could deny his claim for long-term disability benefits); see also Burge v. Republic Engineered Prods., Inc., 432 Fed.Appx. 539, 550 (6th Cir.2011) (“Republic was also not required to consider vocational evidence, as opposed to medical evidence, in analyzing Burge’s claim.” (citing Douglas, 43 Fed.Appx. at 870)).
A number of our sister circuits have reached the same conclusion. See Piepenhagen v. Old Dominion Freight Line, Inc., 395 Fed.Appx. 950, 957 (4th Cir.2010) (“Under this court’s precedents, a plan is not required as a matter of law to obtain vocational or occupational expertise in its evaluation of an employee’s claim.”); Holland v. Int’l Paper Co. Ret. Plan, 576 F.3d 240, 251 (5th Cir.2009) (“Ample record evidence supported the Plan Administrator’s denial of benefits without the necessity of obtaining a vocational rehabilitation expert.”); Conley v. Pitney Bowes, 176 F.3d 1044, 1050 (8th Cir.1999) (noting that vocational expert testimony “is the special creature of social security, and has no relevance to Mr. Conley’s case” (internal citations omitted)); McKenzie v. Gen. Tel. Co. of Cal., 41 F.3d 1310, 1316 (9th Cir.1994), abrogated on other grounds by Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863 (9th Cir.2008) (affirming the grant of summary judgment for the insurer because the decision that the insured was not disabled and could perform other occupations was supported by substantial evidence even absent vocational evidence); Block v. Pitney Bowes Inc., 952 F.2d 1450, 1455 (D.C.Cir.1992) (Ginsburg, J.) (concluding that no provision in the plan required the plan administrator to furnish vocational evidence of the jobs for which plaintiff was fit by education, experience, capability, or training).
This court’s decision in Douglas, 43 Fed.Appx. 864, is particularly instructive on this issue. Douglas claimed that he was totally disabled due to his depression, and his treating physician submitted a report to that effect. Id. at 865-66. Two independent medical examiners concluded, however, that Douglas was not disabled within the meaning of the relevant plan, which provided long-term disability benefits if participants could not work “at any job for which [they are], or could reasonably become, fitted by education, training or experience.” Id. at 866 & n. 2 (alteration in original). Based on these examinations, the plan administrator concluded that Douglas was not totally disabled. Id. at 866. The district court held that the plan administrator’s decision was not arbitrary or capricious. Id. at 866-87.
On appeal, Douglas argued, among other things, that vocational evidence as to what type of jobs he could perform was required before the plan administrator could deny him benefits. Id. at 867. This court disagreed, holding that offering vocational evidence was relevant in the Social Security context but not for the purposes of ERISA. Id. at 870. The court specifically noted that the plan administrator had sufficient information in the record — namely, the reports of the two medical examiners — from which to conclude that Douglas was not totally disabled. Id. at 869. Finally, the court pointed out that Douglas had presented “no evidence that he was prevented, either on his administrative appeal or before the district court, from presenting the testimony of a vocational expert.” Id. at 870. The court therefore affirmed the judgment of the district court. Id. at 872.
We conclude, in light of the above caselaw, that a plan administrator is not required to obtain vocational evidence where the medical evidence contained in *663 the record provides substantial support for a finding that the claimant is not totally and permanently disabled. Applying this principle to the present case, we hold that MetLife was not required to obtain vocational evidence to support its denial of Judge’s claim for total and permanent disability. Although Judge is unlikely to ever again be able to perform the kind of heavy lifting that he performed as a baggage handler, this inability to lift heavy items is not such a broad impairment as to preclude Judge from engaging in other suitable occupations. We therefore find no basis to conclude that MetLife’s determination as to Judge’s future employability was arbitrary or capricious.
E. MetLife was not required to send Judge for an independent medical examination
Judge’s next argument is that MetLife acted arbitrarily and capriciously when it failed to send him for an independent medical examination or have a cardiologist review his records. He also contends that it was improper for only a nurse to review his records.
This court has previously noted that “the failure to conduct a physical examination ... may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination,” but “reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly.” Calvert v. Firstar Fin., Inc., 409 F.3d 286, 295 (6th Cir.2005). A plan administrator’s decision to conduct a file-only review might raise questions about the benefits determination, particularly where the right to conduct a physical examination is specifically reserved in the plan. Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 621 (6th Cir.2006). In the present case, the Plan reserved the right to conduct a physical exam. The question, therefore, is whether the file review conducted in the present case is of the kind to which this court has taken exception.
We conclude that it is not. This court has found fault with file-only reviews in situations where the file reviewer concludes that the claimant is not credible without having actually examined him or her. Bennett v. Kemper Nat’l Servs., Inc., 514 F.3d 547, 555 (6th Cir.2008). In addition, this court has discounted a file review when the plan administrator, without any reasoning, credits the file reviewer’s opinion over that of a treating physician. Elliott, 473 F.3d at 620.
The present case, however, is distinguishable from the above circumstances. Here, the file reviewers made no credibility determinations about Judge and did not second-guess Judge’s treating physicians. The nurses’ findings simply echo those of Judge’s own doctors, make note where the reports lack objective medical evidence in support of the boxes checked, and point out the internal inconsistencies.
Furthermore, Judge’s argument that MetLife acted arbitrarily and capriciously in referring his file to a nurse for review, rather than to a physician, is meritless. This court has previously upheld the decision of a plan administrator where a nurse reviewed the medical evidence, see Boone v. Liberty Life Assurance Co. of Boston, 161 Fed.Appx. 469, 474 (6th Cir.2005), and Judge does not offer any argument as to why having a nurse conduct the review in the present case was arbitrary or capricious. We therefore hold that MetLife did not act arbitrarily or capriciously in conducting a file review.
F. Conflict of interest
Finally, Judge claims that MetLife’s conflict of interest tainted its decision to deny benefits. When a plan administrator “is both the payor of any ... *664 benefits and ... vested with discretion to determine ... eligibility for those benefits,” this creates an “inherent conflict of interest.” Schwalm v. Guardian Life Ins. Co. of Am., 626 F.3d 299, 311 (6th Cir.2010). We consider this inherent conflict of interest as another factor in evaluating the quality of MetLife’s decisionmaking process. See id.
The Supreme Court has noted that such a conflict “should prove more important ... where circumstances suggest a higher likelihood that it affected the benefits decision.” Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). Judge, however, has pointed to nothing more than the general observation that MetLife had a financial incentive to deny the claim. After Glenn, this court has given greater weight to the conflict-of-interest factor when the claimant “offers more than conclusory allegations of bias.” DeLisle v. Sun Life Assurance Co. of Canada, 558 F.3d 440, 445 (6th Cir.2009). Here we find no circumstances indicating a need to give the conflict significant weight. See Schwalm, 626 F.3d at 311-12 (interpreting Glenn and finding no conflict of interest where the administrator “provided a thorough review of the record and there [was] no indication that the review was improperly influenced by the inherent conflict of interest”).
III. CONCLUSION
MetLife’s decision to deny benefits was “the result of a deliberate, principled reasoning process” and “supported by substantial evidence.” See Baker v. United Mine Workers of Am. Health & Ret. Funds, 929 F.2d 1140, 1144 (6th Cir.1991). We therefore AFFIRM the judgment of the district court.