NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0086n.06
No. 20-3512

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Feb 10, 2021
DEBORAH S. HUNT, Clerk

CHARLIE DUNCAN, as Executor of the Estate of
Paul McVay; and JANET FREEL, as Beneficiary of
the Estate of Paul McVay,

  Plaintiffs-Appellants,

v.

MINNESOTA LIFE INSURANCE COMPANY,

  Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
SOUTHERN DISTRICT OF
OHIO

BEFORE: COLE, Chief Judge; SILER and GIBBONS, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge.  While obtaining medical treatment for his
leukemia and lower-body weakness, Paul McVay fell from his wheelchair, suffered a traumatic
subdural hematoma, and died.  Plaintiff Janet Freel, McVay's beneficiary under a life insurance
policy with defendant Minnesota Life Insurance Company, sought payment of McVay's life
insurance and accidental death benefits.  Minnesota Life approved Freel's life insurance claim.
However, it denied the accidental death claim because Minnesota Life believed McVay's leukemia
and weakness indirectly caused his death and there was a policy exclusion for death caused
"directly or indirectly" by "bodily infirmity . . . disease or illness."

Through counsel, plaintiff Charlie Duncan, the executor of McVay's estate, and Freel
(collectively "Duncan") appealed the denial of the accidental death claim.  After receiving
Duncan's appeal, Minnesota Life reached out to Duncan's counsel and requested that counsel

obtain and submit medical records to further evaluate his appeal. Despite Minnesota Life's numerous reminder letters, counsel did not submit those records for almost five years. Over the course of those five years, counsel also went long stretches—up to almost two years—without responding to Minnesota Life's letters. After Duncan's counsel finally submitted the records, Minnesota Life affirmed its denial of accidental death benefits.

Duncan then filed suit in the district court alleging that Minnesota Life's denial of his claim was arbitrary and capricious and plagued by procedural defects. The district court denied Duncan's claims. We affirm.

I.

In September 2010, Paul McVay checked into Hillspring Health Care because he was suffering from acute lymphocytic leukemia, weakness, instability, and bacteremia. These conditions limited McVay's ability to care for himself, and he needed staff assistance getting dressed, getting out of bed, bathing, and eating. These conditions also restricted his mobility; he used a wheelchair to get around, and his gait was unsteady when he did try to walk.

Given McVay's weakness and instability, the staff at Hillspring were concerned that he would fall and suffer a serious injury during his time in their care. For that reason, a physical therapist and an occupational therapist began working with McVay to increase his mobility. While these therapies produced some promising results during the month of October, McVay's progress stalled in early November. On November 1, McVay's occupational therapist noted that he "ha[d] shown less endurance this week," and, the following week, the therapist stated that McVay had "suffered an overall decline in functioning," increased confusion, and declining endurance. DE 54-2, AR, PageID 1276. His physical therapist made similar observations.

In addition to administering physical and occupational therapy, the staff were also taking weekly blood draws so that doctors could observe McVay's platelet count. According to Hillspring's records, a healthy patient should have a platelet count somewhere between 140,000 and 400,000. When McVay arrived at Hillspring, his platelet count was within the healthy range—approximately 150,000. By November 8, that number had dropped to 12,000.

In early November, McVay suffered a series of falls. In total, he fell "5 plus times" during the month of November and was admitted to the hospital twice. DE 54-2, AR, PageID 1280. There are no records from his first trip to the hospital on November 6, but the treating physician from McVay's second trip on November 8 noted that McVay was suffering from head pain and concluded that the "[f]inal diagnosis [was] acute lymphocytic leukemia with low platelets." DE 54-4, AR, PageID 1368.

On November 13, McVay fell again. According to notes taken by Hillspring staff,[1] McVay was in a wheelchair in the hallway with a staff member and tried to stand up. Unable to stand, he fell to the ground. This fall caused "immediate bruising and change in mental statuses" as well as an "intracranial hemorrhage," and McVay passed away later that day. DE 54-2, AR, PageID 1190.

A forensic pathologist conducted an autopsy and concluded that the "cause of death . . . is: Traumatic subdural hematoma. The death is contributed to by leukemia." DE 54-3, AR, PageID 1312. That conclusion was consistent with the opinion of Dr. Russell Uptegrove, who completed the supplementary medical certification. Dr. Uptegrove stated that the "immediate cause" of death was a "traumatic subdural hematoma," and he classified the "manner of death" as an "accident."

---

[1] These notes are not in the administrative record. Neither party has explained why Minnesota Life did not have a copy of these notes. Regardless, given that they are not in the administrative record, we will rely on them only when considering Duncan's procedural claims. *See Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007).

DE 54-2, AR, PageID 1224. He also listed leukemia as a "Significant Condition[] contributing to death but not resulting in the underlying cause." *Id.*

After McVay's death, his sister and beneficiary, Janet Freel, filed a claim with Minnesota Life Insurance Company—the claims administrator for McVay's life insurance policy—seeking payment of McVay's life insurance and accidental death benefits. Upon receiving Freel's claim, Minnesota Life promptly approved payment of the life insurance benefit but concluded that it needed to investigate whether the requirements of the accidental death rider had been met before it could disperse those benefits.

In relevant part, the accidental death rider attached to McVay's life insurance policy read:

This rider provides a benefit for a certificate holder's accidental death . . . which occurs as a result of an accidental injury.
. . .
Accidental death . . . by accidental injury as used in this rider means that the certificate holder's death . . . results, directly and independently of all other causes, from an accidental injury which is unintended, unexpected, and unforeseen.
. . .
In no event will we pay the accidental death . . . benefit where the certificate holder's death . . . results from or is caused directly or indirectly by . . . bodily or mental infirmity, illness or disease[.]
. . .
We will pay the accidental death . . . benefit upon due proof that the certificate holder died . . . as a result of an accidental injury.

DE 54-1, AR, PageID 1096.

To begin its investigation, Minnesota Life reached out to Freel and asked for a certified death certificate; accident, autopsy, and toxicology reports; and a HIPAA authorization. Freel provided the autopsy and toxicology reports and the HIPAA authorization. Minnesota Life then reached out to Freel again and informed her that it needed additional information, such as the "police/accident and or ambulance reports" and the "complete copies of medical records for any hospitalization(s) related to this incident and/or records from the nursing facility." DE 54-2, AR,

PageID 1298. Simultaneously, Minnesota Life reached out to Hillspring and requested doctor's notes, admission and discharge summaries, care plans, problem lists, consultation reports, and lab tests.

On April 15, 2011, after receiving the requested records from Hillspring, Minnesota Life denied the claim for accidental death benefits and notified Freel of her right to appeal that decision. In support of its denial, Minnesota Life stated:

> Based upon the evidence received, Mr. McVay's death was not the sole result of an accidental injury, independent of all other causes, as defined in the policy. The records we received indicate that Mr. McVay had leukemia resulting in low platelet counts. He was receiving physical therapy for significant bilateral lower extremity weakness and was therefore listed at high risk for falls due to his weakness. The records also indicate that he had critically low platelet counts. Low platelet counts have been known to cause spontaneous bleeding. Leukemia is also noted as contributing to Mr. McVay's death. Based on the information available to us, Mr. McVay's death is not covered under the terms of this policy.

*Id.* at 1204. This conclusion appears to have been based, in large part, on the medical opinion of Dr. Lee, one of Minnesota Life's physician consultants.

On June 10, 2011, Charlie Duncan, the executor of McVay's estate, and Freel filed an administrative appeal with Minnesota Life through their attorney. In that appeal, Duncan argued that "it is clear that [McVay's] death resulted solely and independently of all other causes from an intracranial bleed that resulted from a traumatic fall." DE 54-1, AR, PageID 1186. Duncan also attached a letter from McVay's treating physician at Hillspring, Dr. Richard Chamberlain. In that letter, Dr. Chamberlain stated:

> It is my medical opinion that Mr. McVay's death was directly and solely related to an intracranial bleed secondary to trauma from a fall. Mr. McVay has suffered from cancer and has received cancer treatments for years that have resulted in chronic thrombocytopenia. This thrombocytopenia was asymptomatic and caused him no problem except for bruising. The thrombocytopenia did not cause his death and Mr. McVay would not have died if he had not have fallen that day.

DE 54-2, AR, PageID 1190.

In response to this appeal, Minnesota Life asked its medical department to once again review the medical records from Hillspring. It also left Duncan's attorney a voicemail on July 13, 2011 asking him if he could help Minnesota Life obtain records from McVay's hospitalization on November 8. Minnesota Life required assistance obtaining the hospital records because the Hillspring records did not name the hospital to which McVay was admitted. When counsel did not respond to the voicemail, Minnesota Life sent him a letter on September 16, 2011, once again asking for his assistance so that it could continue to review the appeal.

Over the next year, Minnesota Life sent multiple letters to Duncan's counsel asking for assistance obtaining the hospital records. Duncan's counsel did not respond to those letters in any way until November 2012, when he sent a letter that read:

> You have taken an exorbitant amount of time to decide the appeal of this denial of the accidental death benefit, justifying this delay by virtue of your need for medical records. Certainly, your original denial was premised upon some factual basis found in the medical records and we have presented to you the evidence substantiating why your position is wrong. Assuming that your original denial had some basis in fact and records, which has not yet been revealed to us, I do not see why further resort to medical records is needed and further do not understand how it is that you believe that the appealing party should provide these records to you.
>
> Please explain precisely the reason why these additional records are needed as well as the records on which your original decision was based. Once we have this information, perhaps we will more readily understand what information it is that you require and why.

DE 54-1, AR, PageID 1120. Minnesota Life responded in a letter clarifying that its original denial had been based on a policy exclusion and informing counsel that it needed to access the hospital records to determine whether those records changed its initial decision. It also told counsel that "[b]ased on the information we have received thus far, our [decision to deny benefits] remains unchanged." *Id.* at 1118–19. In a response dated February 26, 2013, Duncan's counsel requested the administrative record, which Minnesota Life provided in April 2013.

The next communication between the parties occurred in February 2015, when Duncan's counsel sent a letter to Minnesota Life requesting a decision on the appeal. Minnesota Life notified counsel that it had suspended the appeal when counsel did not respond to the request for the hospital records. It also advised him that it would reopen the appeal if it received those records.[2] Duncan's counsel responded that he would be happy to provide the records if Minnesota Life would identify with specificity which records it was seeking.

In June 2015, Minnesota Life sent a letter directing counsel's attention to the portions of the Hillspring records referencing McVay's hospitalization on November 8. Minnesota Life once again stated that its position would remain unchanged unless it received those records. Approximately one year later, counsel submitted the requested records. In the same letter, he requested that Minnesota Life set a submission date for the appeal.

Minnesota Life never set a submission date for Duncan to submit new evidence, but it asked one of its physician consultants, Dr. Gretchen Bosacker, to review all the evidence currently in McVay's file. Dr. Bosacker reviewed McVay's medical record in Minnesota Life's possession and concluded:

> It is quite possible with a platelet count of 10,000 claimant experienced a spontaneous intracranial hemorrhage and fell out of bed. Because of his extremely low platelet count, he was not able to control his bleeding and he died. Between November 1 and his death, claimant was noted to be more confused and to have worsening endurance. If claimant sustained a subdural hematoma from a fall on 11/13/10, it is likely that that fall, similar to his multiple previous falls, was caused by his extreme weakness, poor balance and debility.

DE 54-1, AR, PageID 1071. Based on Dr. Bosacker's review, Minnesota Life officially denied Duncan's administrative appeal because it found that the policy exclusion for death caused

---

[2] In this letter, Minnesota Life's claims specialist misstated the date of the hospitalization, which may have caused some confusion. She stated that the hospitalization occurred on November 10, 2010, not November 8. This misstatement was corrected in the letter dated June 25, 2015.

"directly or indirectly" by "bodily . . . infirmity, illness or disease" precluded payment. DE 54-4, AR, PageID 1384. Duncan then appealed to federal court.

After the case was docketed, the district court referred the case to a magistrate judge to handle pretrial motions pursuant to 28 U.S.C. § 636(b). Shortly after the case was assigned to a magistrate, Duncan requested that the parties file statements as to the appropriate standard of review. Minnesota Life agreed with that proposal, and both sides submitted a statement. Both parties' statements focused solely on the issue of whether the requirement of "due proof" of accidental death in the rider conferred discretion to Minnesota Life such that Minnesota Life's decision should be reviewed under the arbitrary and capricious standard of review. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The magistrate judge issued an order holding that the words "due proof" conferred discretion, and therefore, Minnesota Life's decision should be reviewed for arbitrariness and capriciousness. Neither party objected to this order.

Six months later, Minnesota Life filed a motion to uphold the administrative decision, and Duncan filed a cross-motion to vacate that decision. The district court granted Minnesota Life's motion to uphold the administrative record because it found that Minnesota Life's decision that the policy exclusion applied was not arbitrary nor capricious. Duncan timely appealed.

II.

This court reviews the district court's legal conclusions, which include its decision "regarding the proper standard to apply in its review of [Minnesota Life's] decision" *de novo*. *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 565–66 (6th Cir. 2013) (quoting *Haus v. Bechtel Jacobs Co.*, 491 F.3d 557, 561–62 (6th Cir. 2007)). There is conflicting precedent in this circuit as to whether the district court's factual determinations should be reviewed *de novo* or for clear error. *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 890 (6th Cir. 2020) (first citing *Javery*

*v. Lucent Techs., Inc. Long Term Disability Plan*, 741 F.3d 686, 700 (6th Cir. 2014) (*de novo*); then citing *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 438 (6th Cir. 2006) (clear error)). We need not resolve this conflict here, however, because the result would be the same under either standard.

III.

Duncan argues that the district court erred in three respects. First, the district court should have reviewed Minnesota Life's decision *de novo*, not under the far more deferential arbitrary and capricious standard. Second, even if the arbitrary and capricious standard applies, the district court erred in upholding Minnesota Life's denial of benefits because Minnesota Life's decision was not rational, Minnesota Life's decision was not the product of a reasoned decision-making process, and Minnesota Life suffered from a conflict of interest. Third, even if the decision was not arbitrary and capricious, Minnesota Life violated ERISA's procedural requirements, and therefore, this case must be remanded to Minnesota Life for a new decision. None of these arguments is persuasive, and we affirm the district court's decision.

A.

Duncan first argues that Minnesota Life's decision should be reviewed *de novo*, not under the arbitrary and capricious standard. In the district court, the magistrate judge issued an order holding that Minnesota Life's decision should be reviewed for arbitrariness and capriciousness. If a party disagrees with a magistrate's order, the party must "serve and file objections to the [magistrate's] order within 14 days after being served with a copy." FED. R. CIV. P. 72(a). "A party may not assign as error a defect in the order not timely objected to." *Id.*; *see also Superior Prod. P'ship v. Gordon Auto. Body Parts Co.*, 784 F.3d 311, 321 (6th Cir. 2015) (recognizing that a party "risks losing the right to appeal the underlying issue" if they fail to timely object to a

magistrate's order (citing *Stemler v. City of Florence*, 126 F.3d 856, 866 n.9 (6th Cir. 1997)));

*Miller v. Meyer*, 644 F. App'x 506, 509 (6th Cir. 2016) ("In the interest of judicial economy . . . a

party *must* file timely objections [to a magistrate's order] with the district court to avoid waiving

appellate review." (alterations in original) (quoting *Smith v. Detroit Fed'n of Tchrs. Loc. 231*, 829

F.2d 1370, 1373 (6th Cir. 1987))).  Duncan never objected to the magistrate's order, and therefore,

he has waived his argument for *de novo* review.

While Duncan's briefing on this issue is somewhat unclear, he appears to raise two

arguments as to why he did not waive this issue.  His first argument is that "[a]ssessment of the

standard of review is an inherent part of the appellate review process and in an ERISA judicial

review proceeding, an important element of the court's judicial review function."  CA6 R.20,

Reply Br., 12.  He cites to no cases explaining how the importance of this issue excuses his waiver.

However, to the extent that Duncan is contending that the "interest of justice" requires the court to

consider the appropriate standard of review, Duncan's contention is without merit.

This court may consider an argument that a party waived in the district court when

consideration of the issue would serve "the interest of justice."  *Alspaugh v. McConnell*, 643 F.3d

162, 166 (6th Cir. 2011) (quoting *Kent v. Johnson*, 821 F.2d 1220, 1223 (6th Cir. 1987)).  Merely

because a claim or issue is important, however, does not mean that the "interest of justice" counsels

this court to consider it.  *See United States v. Wandahsega*, 924 F.3d 868, 879 (6th Cir. 2019)

("The fact that [appellant's] constitutional rights are at issue does not in and of itself make our

decision to decline to entertain his waived arguments a miscarriage of justice.").  Instead, the

interest of justice is typically served when a party has a compelling reason excusing his failure to

object.  *See, e.g.*, *Souter v. Jones*, 395 F.3d 577, 586 (6th Cir. 2005) (deciding that the interest of

justice was served by refusing to apply the waiver rule because there was an intervening decision

of the court that clarified the rule at issue).  Given that Duncan has provided no explanation for his failure to object to the magistrate's order, the interest of justice is not served by considering Duncan's argument that *de novo* review applies.

Duncan's second argument—that he did not waive his argument that 29 C.F.R. § 2560.503-1(*l*) requires *de novo* review—is similarly unavailing.  Duncan did not raise the argument that § 2560.503-1(*l*) requires *de novo* review before the magistrate.[3]  Instead, his sole argument for *de novo* review before the magistrate was that the words "due proof" did not grant Minnesota Life discretion to deny benefits.  *See Firestone Tire & Rubber Co.*, 489 U.S. at 115 ("[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.").  Duncan has not explained why he failed to raise this argument before the magistrate, but his decision to do so means that he has waived it.  *Accord Superior Prod. P'ship*, 784 F.3d at 321 ("[I]t would be inappropriate to permit [the party] to sidestep the [magistrate judge's] order merely by filing a similar motion and forcing the district court to respond anew."); *see also Mathews v. Weber*, 423 U.S. 261, 268 (1975) (noting that the

---

[3] Duncan's argument that 29 C.F.R. § 2560.503-1(*l*)(1) requires *de novo* review is based on a comment to § 2560.503-1(*l*)(1) that reads, in part: "[A] decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference."  Regulation Revising ERISA Claims Procedure, 65 Fed. Reg. 70246, 70255 (Nov. 12, 2000).  The Seventh Circuit recently relied on this comment to conclude that courts should apply *de novo* review in cases in which a plan administrator does not comply with ERISA's timing requirements and issues a decision after the claimant has filed suit in federal court.  *Fessenden v. Reliance Std. Life Ins. Co.*, 927 F.3d 998, 999–1000 (7th Cir. 2019).  However, several district courts have concluded that this comment does not require *de novo* review when—as in this case—the plan administrator issues an untimely decision but does so before the claimant files suit.  *See, e.g.*, *Cooper v. People's United Bank, N.A.*, No. 2:17-cv-76, 2018 U.S. Dist. LEXIS 42467, at *28–29 (D. Vt. Mar. 15, 2018) (concluding that a claimant who waits until after a decision is issued to invoke § 2560.503-1(*l*)(1) waives their argument for *de novo* review under the regulation); *Dragus v. Reliance Std. Life Ins. Co.*, No. 15 C 9135, 2017 U.S. Dist. LEXIS 46917, at *22 (N.D. Ill. March 29, 2017) (same); *Wilson v. Aetna Life Ins. Co.*, 8:15-CV-752, 2016 U.S. Dist. LEXIS 135396, at *24–25 (N.D.N.Y. Sept. 30, 2016) (same).  *But s*ee *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 798 (10th Cir. 2010) (applying *de novo* review to a case in which the plan administrator's decision was late but issued before the claimant filed suit).  Given that we conclude that Duncan waived this argument by failing to object to the magistrate's order, we need not decide whether § 2560.503-1(*l*)(1) requires *de novo* review in cases in which the administrator issues an untimely decision before the claimant files suit.

Section 636(b) of the Magistrates Act was intended to "establish a system capable of increasing the overall efficiency of the Federal judiciary").

Because Duncan waived his arguments for *de novo* review, we apply the arbitrary and capricious standard.

B.

Duncan next argues that even if the arbitrary and capricious standard of review applies, Minnesota Life's decision must be vacated. "Review under [the arbitrary and capricious] standard is extremely deferential and has been described as the least demanding form of judicial review." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (alteration in original) (quoting *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107–08 (7th Cir. 1998)). While the court is not required "merely to rubber stamp the administrator's decision," it should "uphold a benefit determination if it is 'rational in light of the plan's provisions.'" *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (second quoting *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000)). A decision is rational "if it is supported by substantial evidence" and "it is the result of a deliberate, principled reasoning process." *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). We must consider an administrator's conflict of interest as "one factor" in our analysis. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008). Given that Minnesota Life's decision to apply the policy exclusion for death resulting "directly or indirectly" from "bodily or mental infirmity, illness or disease" was (1) supported by substantial evidence, (2) the product of a deliberate, principled reasoning process, and (3) not unduly influenced by Minnesota Life's conflict of interest, we conclude that Minnesota Life's decision was rational.

*First*, Minnesota Life's decision that the policy exclusion applied to McVay's death was supported by substantial evidence. The policy exclusion in the accidental death rider reads: "In no event will [Minnesota Life] pay the accidental death or dismemberment benefit where the certificate holder's death or dismemberment results from or is caused directly or indirectly by . . . bodily or mental infirmity, illness or disease." DE 54-1, AR, PageID 1096. Minnesota Life bears the burden to show that this exclusion applies. *See McCartha v. Nat'l City Corp.*, 419 F.3d 437, 443 (6th Cir. 2005). Minnesota Life argues that it has met that burden because McVay's leukemia and weakness caused him to fall which, in turn, caused his death.

The parties dispute what test we should apply to determine whether McVay's leukemia and weakness were "indirect" causes of his death. Minnesota Life argues that we should apply the test announced by this court in *Ann Arbor Trust Company v. Canada Life Assurance Company*, which precludes recovery if the relevant policy has an exclusionary clause preventing benefits if the injury is caused directly or indirectly from a preexisting illness. 810 F.2d 591, 593 (6th Cir. 1987). Duncan urges us to adopt the "substantial factor" test, which has gained popularity after the Fourth Circuit applied it in *Adkins v. Reliance Standard Life Insurance Company*, 917 F.2d 794, 797 (4th Cir. 1990). However, we need not settle this dispute here because even under the substantial factor test, Minnesota Life's decision was neither arbitrary nor capricious.

The substantial factor test states that, "a pre-existing infirmity or disease is not to be considered as a cause unless it substantially contributed to the disability or loss." *Adkins*, 917 F.2d at 797 (quoting *Colonial Life & Accident Ins. Co. v. Weartz*, 636 S.W.2d 891, 894 (Ky. Ct. App. 1982)). Duncan argues that a pre-existing condition that causes an accident that causes a person's death does not constitute a contributing factor to that person's death, as a reasonable policyholder would understand it. That may be true in the case of a policy that requires the pre-existing

condition to contribute to the death in a "direct" way. However, a pre-existing condition that directly causes an accident that directly causes a person's death substantially contributes to that person's death in an "indirect" way. *See McGuire v. Reliance Std. Life Ins. Co.*, 205 F.3d 1341, 2000 U.S. App. LEXIS 786, at *12–14 (6th Cir. Jan. 18, 2000) (unpublished table opinion); *cf. Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1009–10 (10th Cir. 2004) (vacating an administrator's decision when the chain of causation was "attenuated to the point of absurdity"). Therefore, even under the substantial factor test, Minnesota Life was justified in denying benefits if it possessed substantial evidence to support its theory that McVay's leukemia and weakness caused the fall that caused his death.

Minnesota Life has substantial evidence to support this theory. Although there is no evidence in the record that this court may consider that clearly lays out the circumstances surrounding McVay's death,[4] the autopsy report, supplemental death certificate, and Dr. Chamberlain's letter all note that the cause of death was a fall. In the weeks leading up to his death, McVay was described as having "significant weakness" in his quads and lacking strength in his lower extremities. DE 54-2, AR, PageID 1282. His doctors also noted that his platelet count was dropping, and the last test before his death noted that his platelet count was 12,000, which was well below the healthy reference range of 150,000–400,000. When McVay fell on November 8 (five days before his death), the hospital physician diagnosed him with "acute lymphocytic leukemia with low platelets." DE 54-4, AR, PageID 1368. And both the death certificate and the postmortem exam recognize that leukemia played a role in McVay's death. Additionally, Dr. Bosacker, one of the doctors with whom Minnesota Life consulted, stated that it was likely that

---

[4] There are Hillspring records that indicate that McVay was trying to stand up out of his wheelchair at the time that he fell. However, this evidence is not in the administrative record, and therefore, we cannot consider it when deciding this substantive issue. *See Cooper*, 486 F.3d at 171.

McVay's fall was caused by his "extreme weakness, poor balance, and debility."[5] DE 54-1, AR, PageID 1071. Based on this evidence, Minnesota Life's conclusion that McVay's weakness and leukemia were an indirect cause of his death was rational.[6] *See Jones*, 385 F.3d at 661.

*Second*, to the extent that Duncan raises this argument, Minnesota Life engaged in a "reasoned" deliberative process. Minnesota Life had multiple doctors review McVay's file—which included the autopsy, death certificate, and notes from Hillspring—and also considered the opinion of Dr. Chamberlain, the treating physician. After receiving the Chamberlain letter, Minnesota Life sought more evidence of McVay's prior hospitalizations to ensure that its decision was correct. It also consulted with its legal team on multiple occasions to determine whether benefits were payable. Duncan cites to no cases holding that a similar process was insufficient.

While Duncan believes that long delays demonstrate a lack of a reasoned decision-making process, most of those delays are attributable to his counsel. Even if Duncan were correct that Minnesota Life should have obtained the hospital records on its own, Duncan's counsel should have at least responded to Minnesota Life's repeated attempts to contact him more often than once every couple of years. His failure to do so is what dragged this process out for five years, and Duncan cannot now rely on those delays to undermine the reasonableness of Minnesota Life's decision-making process.

*Third*, the district court properly considered Minnesota Life's conflict of interest. An administrator's conflict of interest is "a factor" that this court should consider in determining

---

[5] Duncan argues that Minnesota Life erred by discounting Dr. Chamberlain's opinion in favor of Dr. Bosacker's without adequate justification. However, Dr. Chamberlain's letter does not discuss the possibility that McVay's leukemia and weakness may have caused the fall that caused his death. Therefore, Minnesota Life did not err by concluding that the letter did not change the result of the appeal.

[6] Minnesota Life also argues that it was justified in denying accidental death benefits because McVay's death was not an "accident" as defined in the policy. Given our conclusion that Minnesota Life's decision that the policy exclusion applied was rational, we need not reach this argument.

whether the administrator's decision was arbitrary or capricious. *Metro. Life Ins. Co.*, 554 U.S. at 115. This factor "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Id.* at 117. In contrast, this factor is "less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id.*

Duncan argues that the district court did not place sufficient weight on the existence of the conflict of interest because there is evidence that Minnesota Life and its employees had a financial incentive to deny claims. For example, Duncan argues that Dr. Bosacker, one of the reviewing physicians, had a conflict of interest because her incentive reports praised her for saving the company money. As Minnesota Life points out, however, the language Duncan cites is unrelated to Dr. Bosacker's work with individual claims. *See* DE 59-3, Incentive Rep., PageID 1957 (referencing "impact [on] bottom line" in context of employee productivity); *id.* at 1960 (discussing cost-saving in the context of large-scale changes to claims processing); *id.* at 1962 (same). Duncan also alleges that some of Minnesota Life's employees' pension plans are funded through a profit-sharing program. But that fact does little more than "point[] to . . . the general observation that [Minnesota Life] had a financial incentive to deny the claim." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 664 (6th Cir. 2013). The district court, therefore, acted appropriately when it took Minnesota Life's conflict of interest into account but chose to give it non-dispositive weight.

In sum, Minnesota Life's decision was supported by substantial evidence, was the product of a reasoned deliberative process, and was not undermined by a conflict of interest. Accordingly, Minnesota Life's denial of Duncan's claim was neither arbitrary nor capricious.

C.

Duncan's final argument focuses on procedural irregularities in Minnesota Life's claims process. "Generally, an administrator's failure to comply with ERISA procedural requirements can result in a remand by the reviewing court to the administrator."[7] *Moore*, 458 F.3d at 436. However, to avoid remand, claims administrators need only "substantially comply" with these requirements. *Id.* Additionally, even if an administrator fails to substantially comply with ERISA, this court will not remand a case to the plan administrator if doing so would constitute a "useless formality" because there is no evidence that the result would change on remand. *Kent*, 96 F.3d at 807.

We need not decide whether Minnesota Life substantially complied with ERISA because remanding this case would constitute a "useless formality." Duncan argues that Minnesota Life violated ERISA procedural requirements by (1) delaying the issuance of an appeal decision for five years, (2) failing to set a submission date, (3) producing an incomplete administrative record, and (4) producing an out-of-date version of the ERISA plan. However, he has not shown how he was prejudiced by these alleged ERISA violations. Duncan had five years to submit additional evidence to substantiate his claim, and Minnesota Life invited him to submit that evidence. Duncan was also given the opportunity to submit evidence in support of his procedural claims in the district court. Despite these opportunities, the only evidence that Duncan has provided regarding McVay's death is doctor's notes from Hillspring that say that McVay's fatal fall occurred as he was trying to stand up out of his wheelchair. Far from contradicting Minnesota Life's conclusion that the policy exclusion applies, this evidence corroborates the idea that McVay's weakness led to his fall which led to his death. Given that this is the only evidence that

---

[7] We review an administrator's compliance with ERISA procedural requirements *de novo*. *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 806 (6th Cir. 1996).

Duncan has provided to demonstrate prejudice, remand would be a "useless formality," and we agree with the district court that it is not appropriate in this case.[8] *See Kent*, 96 F.3d at 807; *cf. Vance v. G.H. Bass & Co.*, No. 97-5261, 1998 U.S. App. LEXIS 2812, *11–12 (6th Cir. Feb. 18, 1998) (unpublished table opinion) (finding remand would not be a "useless formality" because the claimant was never given the opportunity by the administrator or district court to submit additional evidence).

For the foregoing reasons, we affirm.

---

[8] Duncan also raises vague allegations of prejudice stemming from Minnesota Life's failure to produce plan documents, but as Minnesota Life points out, it is the plan administrator—who in this case would be Virginia Bankers Association—who is responsible for producing those documents. *See* 29 U.S.C. § 1024(b); *see also Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 843–44 (6th Cir. 2007); *Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir. 1993).